**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 99-50204
_____


JOSE G. LARA, E.J. LOZANO, ALFREDO JUAREZ, G. TIM HERVEY, EARL L. HARBECK, VOLAR CENTER FOR INDEPENDENT LIVING, LUIS ENRIQUE CHEW, DESERT ADAPT, MYRA MURILLO, MARGARITA LIGHTBOURNE-HARBECK,

Plaintiffs-Appellees,

VERSUS


CINEMARK USA, INC.,


Defendant-Appellant.

_____

Appeal from the United States District Court
For the Western District of Texas
_____
April 6, 2000

Before POLITZ, GARWOOD, and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Defendant-Appellant Cinemark USA, Inc. challenges the district court's determinations that the Americans with Disabilities Act ("ADA") requires "stadium-style" movie theaters to offer wheelchair-bound patrons lines of sight comparable to those enjoyed by the general public and that Cinemark's theaters failed to

**1**

provide such sight lines.[1]  For the reasons that follow, we hold that although the ADA does impose such a requirement, the district court erred in concluding that Cinemark failed to meet its obligations under the Act.  Accordingly, we reverse the judgment of the district court.

                                I.

Cinemark owns and operates "Tinseltown," a twenty-screen theater complex located in El Paso, Texas.  All twenty of the individual theaters in the complex provide "stadium-style" seating.  Stadium-style theaters roughly emulate the seating configuration of a typical sports stadium, providing stepped-seating that rises at a slope of well over five percent.  This elevated seating configuration eliminates the line-of-sight problems that typically occur, for example, when a tall individual sits in front of a shorter individual.

Tinseltown provides wheel-chair accessible seating in its theaters, but not as a part of the stadium-seating configuration.  Because stadium seating requires a steep grade, which is virtually inaccessible to wheelchairs, Tinseltown placed its wheelchair seating on a flat portion of each theater, located near the front of the seating area.  The wheelchair seating placements are

_____

[1] Cinemark also argues that the district court abused its discretion by denying Cinemark's motions to compel the depositions of DOJ officials, by failing to strike Plaintiffs' experts, by permitting certain evidence into the record, and by ordering burdensome remedial relief.  Because we conclude that the district court erred in interpreting the ADA, we need not address these issues.

**2**

surrounded on all sides by general public seating, which, according to Tinseltown, is used even when other seating is available.

In constructing the Tinseltown theaters, Cinemark submitted the architectural plans to the Texas Department of Licensing and Regulation ("TDLR") and the City of El Paso. The city inspectors reviewed the design plans, including wheelchair placements, and granted the theater conditional approval to go ahead with the plans. The city submitted this conditional approval to the TDLR. Cinemark completed construction of the theater in September 1997, and the city and state inspected the completed facilities. The city and state inspectors approved the theaters' seating configurations, including the wheelchair placements.

Shortly after Tinseltown opened, a group of disabled individuals and two advocacy groups ("Plaintiffs") brought suit, alleging that eighteen of Tinseltown's twenty theaters violated the ADA. Plaintiffs alleged that in these theaters, Cinemark located the wheelchair accessible areas too near the screen and too far below screen-level to provide wheelchair-bound moviegoers with comfortable viewing. They contend that while Tinseltown's stadium seating affords non-disabled patrons improved lines of sight, the theaters relegate wheelchair-users to inferior seating areas, where they must uncomfortably crane their necks to watch movies.

Both parties filed motions for summary judgment and the district court entered judgment for the Plaintiffs. The court found that "a person seated in the 'wheelchair row' has to lift his or her eyes and/or crane his or her neck at a very uncomfortable

**3**

angle in order to view the feature on the motion picture screen." Therefore, the court concluded that "the wheelchair-bound patron is denied the full and equal enjoyment of the movie going experience in these theaters."

Subsequently, the district court held two remedy hearings. After considering testimony and argument, the district court entered an "Order Awarding Damages and Granting Injunctive Relief." The order required Cinemark to modify eighteen of its theaters by moving the wheelchair seating location further back from the screen and higher off the floor, and by lowering the screen by approximately one foot. The court also granted attorneys fees to each of the plaintiffs and $100 in damages to each of the individual wheelchair-bound plaintiffs.

Cinemark's principal argument on appeal is that the district court incorrectly interpreted and applied the ADA and the ADA Guidelines promulgated pursuant to the Act. We now turn to those arguments.

## II.

We review the district court's interpretation of the statute de novo. See Woodfield v. Bowman, 193 F.3d 354, 358 (5th Cir. 1999).

Title III of the ADA provides that: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns . . . or operates a place of public

**4**

accommodation." 42 U.S.C. § 12182(a). Congress delegated to the Department of Justice the responsibility for issuing regulations in order to enforce this mandate. 42 U.S.C. § 12186(b). Accordingly, the DOJ, in conjunction with the Architectural and Transportation Barriers Compliance Board ("Access Board"), issued ADA Accessability Guidelines ("ADAAG").[2] At the center of this litigation is Section 4.33.3 of the ADAAG, which provides that in assembly areas:

> Wheelchairs shall be an integral part of any fixed seating plan and shall be provided so as to provide people with physical disabilities a choice of admission prices and lines of sight comparable to those for members of the general public. They shall adjoin an accessible route that also serves as means of egress in case of emergency. At least one companion fixed seat shall be provided next to each wheelchair seating area. When the seating capacity exceeds 300, wheelchair spaces shall be provided in more than one location. Readily removable seats may be installed in wheelchair spaces when the spaces are not required to accommodate wheelchair users.
>
> EXCEPTION: Accessible viewing positions may be clustered for bleachers, balconies, and other areas having sight lines that require slopes of greater than 5 percent. Equivalent accessible viewing positions may be located on levels having accessible egress.

ADAAG, 28 C.F.R. pt. 36, App. A at 4.33.3 (1999).

The district court held that Cinemark violated section 4.33.3 because its Tinseltown theaters failed to provide wheelchair-bound

---

[2] The Department of Justice did not draft the language in the ADAAG. Rather, Congress has charged the Access Board with "establish[ing] and maintain[ing] minimum guidelines and requirements for the standards issued pursuant to" Title III of the Act. 29 U.S.C. § 792(b). The DOJ adopted these standards in toto pursuant to Congress's insistence that the DOJ's regulations be "consistent with the minimum guidelines and requirements issued by" the Board. See 42 U.S.C. § 12186(c).

patrons with "lines of sight comparable to those for members of the general public."  The court noted that while the general public could choose to sit in any row, Tinseltown confined wheelchair-bound patrons to an area with an "average viewing angle . . . [of] above thirty-five degrees, which the Plaintiff's expert witness has properly described as 'well into the discomfort zone.'"

Cinemark argues both that section 4.33.3 does not apply to its theaters and, alternatively, that it provides wheelchair-users with comparable lines of sight.

## A.

Cinemark first argues that the "lines of sight comparable" provision of section 4.33.3 only applies to theaters with a capacity of over 300 seats. Cinemark posits that section 4.33.3, when read as a whole, requires only that theaters with over 300 seats provide handicapped patrons with "the choice of admission prices and lines of sight comparable to" to those enjoyed by the general public.  Emphasizing the phrase "choice of," Cinemark argues that section 4.33.3 simply imposes a dispersal requirement, requiring larger auditoria to provide wheelchair-users with a variety of admission prices and viewing locations.  Cinemark explains that the DOJ's goal of dispersal could not be accomplished by simply requiring a "choice of admissions prices," because many large auditoria, such as college sports venues, charge a single admission price even for different viewing locations.  Cinemark concludes that because the regulation explicitly permits theaters with seating capacities under 300 to provide wheelchair seating in

**6**

a single area, its theaters are exempt from dispersal, and hence, the entire regulation.[3]

In interpreting a statute or regulation, we first look to the statute or regulation's plain language. See United States v. Raymer, 876 F.2d 383, 389 (5th Cir. 1989). Moreover, we must consider the regulation as a whole, with the assumption that the Department intended each of the regulation's terms to convey meaning. United States v. Bailey, 516 U.S. 143, 145 (1995). Based on such a reading of the regulation, we cannot agree that the "lines of sight language" demands nothing more than mere dispersal.

First, the "lines of sight" language is entirely divorced from the dispersal requirement. The provision requiring multiple seating locations comes at the end of the regulation and does not in any way modify the earlier requirements.

Second, the phrase "choice of" modifies only "admissions prices" and not "lines of sight." Indeed, the DOJ has consistently treated "comparable choice of admission prices" and "comparable lines of sight" as two separate requirements. See, e.g., ADAAG, 28 C.F.R. pt. 36, App. B at 650 (1999)("the final rule adds . . . a requirement that . . . wheelchair seating provide lines of sight

---

[3] Cinemark also invokes Section 4.33.3's exemption for "bleachers, balconies, and other areas having sight lines that require slopes of greater than 5 percent." ADAAG § 4.33.3. In these areas, "equivalent accessible viewing positions may be located on levels having accessible egress" and may be clustered. Id. Cinemark notes that its stadium-style seating requires a slope well in excess of five percent and argues that it is therefore exempt from section 4.33.3. The 5 percent slope exemption, however, permits only the clustering of seats. It does not permit Cinemark to avoid section 4.33.3's comparable line of sight requirement.

and choice of admission prices comparable to those for the general public"); 1994 DOJ Technical Assistance Manual ("TAM") Supp. § III-7.5180 (In addition to requiring . . . dispersion of wheelchair locations, ADAAG requires that wheelchair locations provide people with disabilities  lines of sight comparable to those for members of the general public."). Regardless of whether the DOJ's interpretation demands deference, these statements demonstrate that, since the inception of section 4.33.3, the Department has consistently treated "choice of admissions prices" and "lines of sight" as two separate requirements. Cf. Paralyzed Veterans of America v. D.C. Arena, L.P., 117 F.3d 579, 588 (D.C. Cir. 1997) (holding that the Department's TAM is entitled to deference).

Third, Cinemark's interpretation effectively reads out the opening clause of the "lines of sight" portion of section 4.33.3, which explains that "wheelchairs shall be an integral part of any fixed seating plan and shall be provided as to provide people with physical disabilities with a choice of . . . lines of sight comparable to those for members of the general public." (emphasis added).

Finally, by applying section 4.33.3 only in instances where seating capacity exceeds 300, Cinemark would permit smaller theaters to avoid all of the placement requirements of the section, including its demand that wheelchair seating "adjoin an accessible route that also serves as a means of egress in case of emergency." Such an interpretation would contravene the very purpose of the

**8**

regulation and of the ADA.  Accordingly, we conclude that section 4.33.3 imposes two independent requirements: (1) that theaters with over three-hundred seats provide wheelchair spaces in more than one location, and (2) that smaller facilities provide people with physical disabilities with lines of sight and choice of ticket prices comparable to those enjoyed by  the general public.  Accord Paralyzed Veterans of America, 117 F.3d at 583 (holding that lines of sight requirement is independent of dispersal requirement).

B.

Cinemark next contends that its theaters do afford wheelchair-bound moviegoers with "lines of sight comparable to those for members of the general public."  According to Cinemark, the wheelchair areas are "comparable" because they are located in the midst of general seating and do not suffer from any obstructions.

The text of section 4.33.3 provides little guidance as to whether theaters must provide wheelchair-bound moviegoers with comparable viewing angles or simply unobstructed lines of sight. And although a number of courts have considered whether section 4.33.3 requires auditoria to provide wheelchair seating areas with lines of sight that are unobstructed by standing spectators, no court has considered whether theaters must provide those seating areas with "viewing angles" that are as comfortable as those enjoyed by the general public.  See, e.g.,Paralyzed Veterans, 117 F.3d at 583-4 (holding that 4.33.3 does require auditorium-owners to provide wheelchair areas with lines of sight unobstructed by standing spectators); Caruso v. Blockbuster-Sony Music

**9**

<u>Entertainment Ctr. at the Waterfront</u>, 193 F.3d 730, 736 (3d Cir. 1999)(holding that 4.33.3 does not reach issue of sightlines over standing spectators); <u>Independent Living Resources v. Oregon Arena Corp.</u>, 982 F.Supp. 698, 743 (D. Or. 1997)(holding that 4.33.3 "does not purport to decide whether lines of sight over standing spectators are –- or are not -- necessary in order to comply with the ADA").

Unlike questions of "viewer obstruction," which the DOJ and Access Board explicitly considered before issuing section 4.33.3, <u>see</u> 56 Fed. Reg.  2296, 2314 (1991); 56 Fed. Reg. 35408, 35440 (1991), questions regarding "viewing angle" did not arise until well after the DOJ promulgated section 4.33.3.  Similarly, while the DOJ's 1994 Technical Assistance Manual explicitly requires theaters to provide "lines of sight over spectators who stand," the manual does not address problems involving viewing angles.  <u>See</u> 1994 DOJ TAM Supp. § III-7.5180.  Indeed, the Access Board has just recently proposed modifying section 4.33.3 to require explicitly that auditoria provide wheelchair-users with unobstructed lines of sight.  64 Fed. Reg. 62248, 62277-78 (Nov. 16,1999).  As the Access Board explained:

> DOJ has asserted in attempting to settle particular cases that wheelchair seating locations [in stadium-style theaters] must: (1) be placed within the stadium-style section of the theater . . .; (2) provide viewing angles that are equivalent or better than the viewing angles . . . provided by 50 percent of the seats in the auditorium, counting all seats of any type sold in that auditorium; and (3) provide a view of the screen, in terms of lack of obstruction . . . that is in the top 50 percent of all seats of any type sold in the auditorium.  The Board is considering whether to include specific requirements in the final

**10**

> rule that are consistent with the DOJ's interpretation of 4.33.3 to stadium-style movie theaters.

64 Fed. Reg. at 62278. Significantly, the proposed regulations define "line of sight" problems only in the context of obstructed views, and recognize that additional language will be necessary to codify the DOJ's litigating position. Id.

Moreover, although it appears that at the time the DOJ adopted Section 4.33.3, the phrase "lines of sight" lacked a clear meaning in the ADA context, it is clear that in a number of other contexts, the phrase meant unobstructed view. See, e.g., 47 C.F.R. § 73.685 (2000)(FCC regulation requiring that antennae have line of sight, without obstruction, of the communities that they serve); 46 C.F.R. § 13.103 (2000)(defining direct supervision as having line of sight of the person being supervised); 36 C.F.R. § 2.18 (2000)(forbidding people under age 16 from operating snowmobiles unless they are "within line of sight" of a responsible person over age 21).

In light of the lack of any evidence that the Access Board intended section 4.33.3 to impose a viewing angle requirement, the Board's recent statement that it had not yet decided whether to adopt the DOJ's litigating position with respect to stadium-style theaters, and the common meaning of "lines of sight," we cannot conclude that the phrase "lines of sight comparable" requires anything more than that theaters provide wheelchair-bound patrons with unobstructed views of the screen. To impose a viewing angle requirement at this juncture would require district courts to interpret the ADA based upon the subjective and undoubtedly diverse preferences of disabled moviegoers. Congress granted the DOJ, in

**11**

conjunction with the Access Board, the authority to promulgate regulations under the ADA in order to provide the owners and operators of places of public accommodation with clear guidelines for accommodating disabled patrons. See generally House Report No. 101-485(I), at 124-25, 139-40 (1990), reprinted in 1990 U.S.C.C.A.N. 407-08, 421-22. Accordingly, in the absence of specific regulatory guidance, we must hold that section 4.33.3 does not require movie theaters to provide disabled patrons with the same viewing angles available to the majority of non-disabled patrons.

Plaintiffs neither contend that Tinseltown's wheelchair-accessible seating suffers an obstructed view, nor dispute that Tinseltown located the wheelchair seating amidst general public seating. As such, the district court erred, as a matter of law, in finding that Cinemark failed to provide wheelchair-bound patrons with lines of sight comparable to those for members of the general public.

### III.

For the foregoing reasons, the judgment of the district court is REVERSED and judgment is RENDERED for Defendants.