OREGON PARALYZED VETERANS OF AMERICA, an Oregon non-profit Corporation, Plaintiff,

and

Kathy Stewmon; Tina Smith; Kathy Braddy, Plaintiffs–Appellants,

v.

REGAL CINEMAS, INC., a Tennessee Corporation doing business in Oregon; Eastgate Theatre Inc., dba Act III Theater, Inc., Defendants–Appellees.

No. 01–35554.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 2, 2002.

Filed Aug. 13, 2003.

Kathleen L. Wilde, Oregon Advocacy Center, Portland, OR, for the plaintiffs-appellants.

Laura M. Franze, Akin, Gump, Strauss, Hauer & Feld, LLP, Dallas, TX, for the defendants-appellees.

Before: B. FLETCHER, KLEINFELD and McKEOWN, Circuit Judges.

Opinion by Judge BETTY B. FLETCHER; Dissent by Judge KLEINFELD.

BETTY B. FLETCHER, Circuit Judge:

This appeal concerns the validity of the Department of Justice's ("DOJ") interpretation of its own regulation requiring that movie theaters, pursuant to Title III of the ADA, provide comparable lines of sight for wheelchair-bound and non-wheelchair-bound moviegoers. Three individual, disabled plaintiffs and the Oregon Paralyzed Veterans of America ("OPVA") sued two companies that own and operate movie theaters in Oregon. The theaters at issue located all wheelchair-accessible seats in the front rows, where the vertical viewing angle was significantly sharper than in the rest of the theater.

The plaintiffs raised three claims. First, they alleged that the "stadium seating" plans in six of the defendants' movie theaters violate Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182, and DOJ's regulations promulgated thereunder. The plaintiffs also claimed that the seating plans violate Oregon's public accommodations statute, Or.Rev. Stat. § 659.425(3), and claimed negligence in the design, construction, and operation of the stadium-riser theaters. They sought declaratory and injunctive relief, compensatory and punitive damages under the Oregon statute, and damages for negligence (in an amount to be proved at trial), in addition to attorneys' fees and costs.

The district court granted summary judgment to the defendants on all three claims. The three individual plaintiffs [1] now appeal the district court's decision as to the ADA claim only. We have jurisdiction under 28 U.S.C. § 1291, and we reverse.

## I. FACTS

Viewed in the light most favorable to the appellants, the non-moving parties, *Oliver v. Keller*, 289 F.3d 623, 626 (9th Cir.2002), the record reveals the following facts. The plaintiffs-appellants in this case are three disabled, wheelchair-bound individuals living in Oregon. The defendants are Regal Cinemas, Inc. and Eastgate Theatre, Inc., two companies that own and/or operate six movie theaters in Oregon.[2] All six theaters utilize a design incorporating "stadium-riser seating," which places most of the theater seats on stepped risers rather than on a sloped floor. The purpose of the stadium design is to maximize unobstructed views for theater patrons. In most cases, the first few rows at the front of the theater are set on a sloped floor; there is an aisle at the entry level of the theater separating the sloped portion of the seating from the riser section, and the stadium seats (approximately 6–13 rows) then rise behind the aisle, with each row raised 15–18″ above the one in front of it.

In order to get to the seats in the stadium riser section, patrons must walk up stairs on either side of the seating section. The riser seats are not wheelchair-accessible. In all six theaters, seating for disabled patrons is located only in the first five rows; in five of the six theaters,[3] wheelchair-accessible seating is located only on the sloped portion of the floor, not

---

1. OPVA, the fourth plaintiff in the original lawsuit, has not joined in this appeal.

2. The six theaters are the Movies on TV theater complex in Washington County, the Division Street Theaters in Multnomah County, the Stark Street theater complex in Portland, the Wilsonville 9 complex in Clackamas County, the Santiam 11 complex in Marion County, and the Sherwood 10 theater in Yam-

hill County. All six were designed and constructed for first occupancy after January 26, 1993, and are thus subject to the requirements of Title III of the A.D.A. for "new construction." 42 U.S.C. § 12183(a)(1).

3. The only exception is the Sherwood Theater, in which four of the auditoriums have wheelchair-accessible seating located in the stadium riser areas.

in the aisle or in the stadium seating, with over half of the accessible seats in the very front row. The result is that all patrons who require wheelchairs have no choice but to sit in the first few rows of the theater.

As the appellants point out, locating all of the wheelchair-accessible seating in the first few rows of the theaters creates significant disadvantages for wheelchair-bound patrons. Plaintiffs' experts, who visited the theaters and conducted research there, found that the vertical lines of sight for the wheelchair seating locations ranged from 24 to 60 degrees, with an average of approximately 42 degrees, as compared with the average median line of sight of 20 degrees in the non-wheelchair seating—a difference the experts termed a "tremendous disparity." In reality, however, the disparity is even greater, because wheelchair-bound patrons cannot slump in their seats and recline their bodies in order to adjust for the unfavorable viewing angle, as can able-bodied patrons sitting in the same part of the theater.

In its engineering guideline for movie theaters, the Society of Motion Picture and Television Engineers ("SMPTE") concluded that, for most viewers, physical discomfort occurs when the vertical viewing angle to the top of the screen exceeds 35 degrees, and when the horizontal line of sight measured between a perpendicular to the viewer's seat and the centerline of the screen exceeds 15 degrees. Soc'y of Motion Picture & Television Eng'rs, *SMPTE Engineering Guideline: Design of Effective Cine Theaters* 5 (1994) (hereinafter *SMPTE Guideline*). Thus, not only do the wheelchair seats themselves have, on average, highly unfavorable viewing angles relative to the rest of the theater, but the patrons sitting in them will be less able than other patrons to adjust for those angles by shifting position in their seats.

The experts' conclusions were also borne out by the individual plaintiffs' own experiences in the theaters, as recounted in their affidavits and deposition testimony. Kathy Stewmon, who has multiple sclerosis and has been wheelchair-bound since 1989, related:

Sitting in [the front row], so close to the screen, the screen was so huge that I couldn't focus on it; it made me dizzy trying to focus. I had to keep moving my head and neck back and forth to look at the whole movie screen. I found myself losing the story because I was working so hard to watch the screen; I couldn't concentrate on the movie.

. . .

I only lasted about 15 minutes in the front row—I couldn't tolerate it. My family members dragged my wheelchair up the stairs, which was [a] very dangerous and precarious thing to do, so I could watch the movie.

Plaintiffs Tina Smith and Kathleen Braddy related similar experiences: sitting in the front row of the theater made Smith nauseous and gave her a headache, and Braddy testified that she was unable to watch a movie with her grandson from the wheelchair-accessible rows of the theater because she would have had to bend her neck back to the point where her vision would have been blurry, and because the sound was "not comfortable that close."

In the district court, both the plaintiffs and the defendants moved for summary judgment. The district court denied the plaintiffs' motion for summary judgment and granted the defendants' motion for summary judgment.[4] *Oregon Paralyzed*

---

4. The district court granted the defendants' motion for summary judgment on all three grounds. However, because only the ADA claim is presented in this appeal, this section will address only those parts of the district court's opinion that pertain to it.

*Veterans of Am. v. Regal Cinemas, Inc.,* 142 F.Supp.2d 1293 (D.Or.2001). The district court recognized that the defendants' movie theaters are public accommodations subject to Title III of the ADA, which provides generally:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a). As the district court went on to note, Congress directed the Department of Justice ("DOJ") to issue regulations that provide substantive standards applicable to facilities covered under Title III. 42 U.S.C. § 12186(b); *Paralyzed Veterans of Am. v. D.C. Arena L.P.,* 117 F.3d 579, 580 (D.C.Cir.1997), *cert. denied sub nom. Pollin v. Paralyzed Veterans of Am.,* 523 U.S. 1003, 118 S.Ct. 1184, 140 L.Ed.2d 315 (1998). DOJ, in turn, adopted as regulations a set of guidelines promulgated by the Architectural and Transportation Barriers Compliance Board ("Access Board"), a body charged with "establish[ing] and maintain[ing] minimum guidelines and requirements for the standards issued pursuant to" Title III of the A.D.A. 29 U.S.C. § 792(b)(3)(B). These regulations, known as the Americans with Disabilities Act Accessibility Guidelines ("ADAAG"), provide, in relevant part, as follows:

> Wheelchair areas shall be an integral part of any fixed seating plan and shall be provided so as to provide people with physical disabilities a choice of admission prices and lines of sight comparable to those for members of the general public.

28 C.F.R. Pt. 36, App. A, § 4.33.3.

In granting the defendants' motion for summary judgment, the district court held that the language about "lines of sight comparable to those for members of the general public" in § 4.33.3 does not require that wheelchair-accessible seating afford patrons comparable viewing angles to those in non-accessible seating. 142 F.Supp.2d at 1297–98. The district court followed what was, at the time, the only federal appellate decision in the nation addressing the viewing-angle issue directly: *Lara v. Cinemark USA, Inc.,* 207 F.3d 783 (5th Cir.2000). In *Lara,* the district court had held that, based on the plain language of § 4.33.3, stadium-style seating arrangements like the ones at issue in this case failed to meet the statutory and regulatory requirements:

> "Comparable" simply means capable of being compared; equivalent or similar.... [T]he present configuration of the eighteen Tinseltown theaters does not afford wheelchair-bound patrons comparable lines of sight. Either the row designated for wheelchair-bound patrons is too close to the screen, or the screen is too high off the ground, or a combination of both. The average viewing angle from this row is above thirty-five degrees, which the Plaintiffs' expert witness has properly described as "well into the discomfort zone." It should be stressed that this is not some abstract scientific theory which is difficult for the lay person to comprehend. It simply means that a person seated in the "wheelchair row" has to lift his or her eyes and/or crane his or her neck at a very uncomfortable angle in order to view the feature on the motion picture screen.... The wheelchair-bound patron is denied the full and equal enjoyment of the movie going experience in these eighteen theaters. Therefore, these theaters as presently configured do not conform to the requirements of the Americans with Disabilities Act and Standard 4.33.3.

*Lara v. Cinemark USA, Inc.,* No. EP–97–CA–502–H, 1998 WL 1048497 (W.D.Tex. Aug. 21, 1998), at *2. The Fifth Circuit reversed, noting that "questions regarding 'viewing angle' did not arise until well after the DOJ promulgated section 4.33.3." *Lara,* 207 F.3d at 788. Rather, according to the Fifth Circuit, the primary concern animating section 4.33.3 was that wheelchair users have *unobstructed* views, not that they sit at a certain viewing angle to the screen. *Id.* Thus, the court concluded:

> In light of the lack of any evidence that the Access Board intended section 4.33.3 to impose a viewing angle requirement, the Board's recent statement that it had not yet decided whether to adopt the DOJ's litigating position with respect to stadium-style theaters, and the common meaning of "lines of sight," we cannot conclude that the phrase "lines of sight comparable" requires anything more than that theaters provide wheelchair-bound patrons with unobstructed views of the screen. To impose a viewing angle requirement at this juncture would require district courts to interpret the ADA based upon the subjective and undoubtedly diverse preferences of disabled moviegoers.

207 F.3d at 789.

The district court in this case expressly adopted the Fifth Circuit's reasoning in *Lara,* notwithstanding what it termed the "plain meaning" of § 4.33.3. 142 F.Supp.2d at 1297. The district court found support for the Fifth Circuit's position in "plaintiff's acknowledgment that the stadium riser design was not adopted for movie theaters until 1995—four years after Section 4.33.3 was adopted by DOJ." *Id.* Moreover, the court apparently adopted as a matter of law *Lara's* holding that locating the wheelchair-accessible seats only in the non-stadium portion of the theater did not violate § 4.33.3's requirement that the ac-

cessible seating be an "integral part of any fixed seating plan"—even though it "[did] not read plaintiffs' First Amended Complaint to state such a theory of liability under the ADA." 142 F.Supp.2d at 1298 n. 3.

The district court rejected the plaintiffs' argument that DOJ's interpretation of § 4.33.3, as articulated in the *Lara* litigation, was entitled to deference. *Id.* at 1297. DOJ had filed an amicus brief in the *Lara* case in which it interpreted § 4.33.3 to require that, in stadium-style theaters, "wheelchair locations must be provided lines of sight in the stadium seating seats within the range of viewing angles as those offered to most of the general public in the stadium style seats, adjusted for seat tilt." [5] The district court found that DOJ's interpretation was not entitled to deference because, for the reasons set forth by the Fifth Circuit in *Lara,* it would be "unreasonable and inconsistent with the history of Section 4.33.3 (including statements by the Access Board) to interpret it to require stadium-style theaters to provide wheelchair-bound moviegoers with comparable viewing angles." 142 F.Supp.2d at 1297–98. The district court also expressed skepticism that an amicus brief was an appropriate forum to announce an agency's interpretation of a rule in any case. Accordingly, the district court granted summary judgment to the defendants on the plaintiffs' ADA claim, holding that DOJ's interpretation of § 4.33.3 was inconsistent with the regulation and therefore not entitled to deference. This appeal followed.

## II. DISCUSSION

### A. *Standard of Review*

A grant of summary judgment is reviewed de novo. *See Clicks Billiards, Inc.*

---

**5.** This continues to be DOJ's interpretation, as explained in its amicus brief in this case.

*v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir.2001). Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Accordingly, the appellate court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *See Oliver*, 289 F.3d at 626.

B. *Analysis*

 As this Court has observed,

We owe agency interpretations of their own regulations substantial deference. *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994). When the meaning of regulatory language is ambiguous, the agency's interpretation of the regulation controls "so long as it is 'reasonable,' that is, so long as the interpretation sensibly conforms to the purpose and wording of the regulations." *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 150–51, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991) (internal citations and quotations omitted).

*Lal v. Immigration & Naturalization Serv.*, 255 F.3d 998, 1004 (9th Cir.2001); *see also id.* at 1004 n. 3 (explaining that

the assessment of an agency's interpretation of a regulation, as opposed to a statute, presents a different question from the *Chevron* line of cases); *Simpson v. Hegstrom*, 873 F.2d 1294, 1297 (9th Cir.1989) ("We generally defer to an administrator's interpretation of her own regulations unless it is 'plainly erroneous or inconsistent with the regulation.'").

In this case, the district court concluded that DOJ's interpretation [6] of § 4.33.3 is so inconsistent with the regulation as to preclude deference—that is to say, that DOJ's interpretation is unreasonable. That conclusion is unwarranted. The language at issue is § 4.33.3's reference to "lines of sight comparable to those for members of the general public." Webster's Third New International Dictionary defines "line of sight," in relevant part, as "a line from an observer's eye to a distant point (as on the celestial sphere) toward which he is looking or directing an observing instrument." *Id.* at 1316 (1993); *see also* Webster's Ninth New Collegiate Dictionary 695 (1991) (same). In the context of a movie theater, this means a line extending from the viewer's eye to the points on the screen where the film is projected, taking into account the angle from the viewer's eye to those points. In its engineering guideline, promulgated in 1994, the SMPTE explained:

In addition to ensuring that everyone will see well, seating in the effective cine theater must avoid physical discomfort,

---

6. Insofar as the district court suggested that an agency interpretation first advanced in an amicus brief is somehow less valid or less entitled to deference than one promulgated elsewhere, this is a position without legal support. *See Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (analyzing the Secretary of Labor's interpretation of a rule articulated in an amicus brief, holding that "[b]ecause the salary-basis test is a creature of the Secretary's own regulations, his interpretation of it is, under our jurisprudence, controlling unless 'plainly erroneous or inconsistent with the regulation.'"); *see also id.* (characterizing this standard as "deferential," and noting that the phrase at issue "comfortably bears the meaning the Secretary assigns"); *Navellier v. Sletten*, 262 F.3d 923, 945 (9th Cir.2001) ("An agency's interpretation of one of its own rules, including an interpretation expressed in an *amicus* brief, is controlling unless plainly erroneous or inconsistent with the rule.").

which occurs when the vertical viewing angle to the top of the screen image is excessive or the lateral viewing angle to the centerline of the screen requires uncomfortable head and/ or body position. Since the normal line of sight is 12 to 15 below the horizontal, seat backs should be tilted to elevate the normal line of sight approximately the same amount. For most viewers, physical discomfort occurs when the vertical viewing angle to the top of the screen exceeds 35 , and when the horizontal line of sight measured between a perpendicular to his seat and the centerline of the screen exceeds 15 .

*SMPTE Engineering Guideline* at 4–5. Indeed, the National Association of Theatre Owners ("NATO"), participating in this case as amicus curiae on behalf of the appellees, has advanced a similar conception of "viewing angle." Steven John Fellman, *NATO Position Paper on Wheel-*

*chair Seating in Motion Picture Theatre Auditoriums* 6 (1994) ("NATO explained that lines of sight are measured in degrees . . . .").[7]

The question here, then, is whether it is unreasonable for DOJ to interpret "comparable line of sight" to encompass factors in addition to physical obstructions, such as viewing angle. The answer, in light of the plain meaning of the regulation both in general and as understood in the movie theater industry, is "no." We do not accept the *Lara* court's suggestion[8] that the legislative and administrative history of § 4.33.3 compels a different answer.[9] We agree that stadium-style movie theaters were rare in this country until the mid–1990s, and the older theaters, which were built on sloping floors, did not generally create the same kinds of dramatic disparities in vertical viewing angles that stadium-style theaters do. But the fact that DOJ may not have been contemplating

---

7. We disagree with the Fifth Circuit's suggestion in *Lara,* 207 F.3d at 789, that it is impossible to parse "comparability" without embarking on subjective judgments of where each individual prefers to sit in a movie theater. The point is this: Able-bodied movie theater patrons in a stadium-style theater may choose from a wide range of viewing angles, most of which are objectively comfortable according to SMPTE standards, regardless of what personal viewing preferences individuals may have *within* that comfortable range. As it currently stands in the theaters at issue, however, wheelchair-bound patrons may sit only in the first few rows, where uncontroverted evidence demonstrates that, not only is the viewing angle objectively uncomfortable for all viewers, but the discomfort is exacerbated for wheelchair-bound viewers relative to able-bodied viewers sitting in the same row. Note that the SMPTE has determined that physical discomfort occurs "for most viewers" when the viewing angle exceeds *35* degrees; the *average* vertical viewing angle for disabled patrons in the subject theaters is *42* degrees. Thus, there is objective evidence that disabled patrons would likely experience discomfort in the theaters in question.

8. Nor are we alone in so doing. *See United States v. Hoyts Cinemas Corp.,* 256 F.Supp.2d 73, 88 (D.Mass.2003) ("This Court now rules (notwithstanding the contrary reasoning in the *Lara* decision) that the comparable 'lines of sight' requirement of Section 4.33.3 means that viewing angles *must* be taken into account.").

9. The Fifth Circuit's reasoning in *Lara,* and the district court's adoption of that reasoning in this case, seems particularly specious in light of the Supreme Court's recent pronouncement on attempts to circumvent plain meaning in construing administrative interpretations. *See Washington State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler,* 537 U.S. 371, 123 S.Ct. 1017, 1026, 154 L.Ed.2d 972 (2003) ("While these administrative interpretations are not products of formal rulemaking, they nevertheless warrant respect in closing the door on any suggestion that the usual rules of statutory construction should get short shrift for the sake of reading 'other legal process' in abstract breadth.").

viewing-angle issues in the context of sta-. dium-style seating at the time when § 4.33.3 was promulgated is not dispositive. Rather, the issue is whether a broadly-drafted regulation—with a broad purpose—may be applied to a particular factual scenario not expressly anticipated at the time the regulation was promulgated—a question that the Supreme Court has answered in the affirmative. *See Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) (holding that, where statutory text is unambiguous, "the fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." (internal quotation marks omitted) (citing *S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985))). We see no reason to treat regulations differently.

### III. CONCLUSION

One of the central goals of Title III of the ADA is to ensure that people with disabilities have access to "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). In the theaters at issue in this case, wheelchairbound movie theater patrons must sit in seats that are objectively uncomfortable, requiring them to crane their necks and twist their bodies in order to see the screen, while non-disabled patrons have a wide range of comfortable viewing locations from which to choose. We find it simply inconceivable that this arrangement could constitute "full and equal enjoyment" of movie theater services by disabled patrons. Yet, in rejecting DOJ's interpretation, this is precisely what the district court in this case held: No matter where

in the theater the seats are, and no matter how sharp the viewing angle, so long as there is no physical object standing between the disabled patron and the screen, DOJ is not free to interpret its own regulation as requiring anything more.

We hold that DOJ's interpretation of "lines of sight comparable to those for members of the general public" in § 4.33.3 to require a viewing angle for wheelchair seating within the range of angles offered to the general public in the stadium-style seats is valid and entitled to deference. Accordingly, the judgment of the district court is reversed, and the case is remanded with instructions to enter summary judgment in favor of the plaintiffs on their ADA claim.

REVERSED AND REMANDED.

KLEINFELD, Circuit Judge, dissenting.

I respectfully dissent.

The majority sets up a conflict with the Fifth Circuit,[1] adopts an unreasonable construction of the applicable regulation, and puts theater owners in a position of impossible uncertainty as to what they must do to comply with the law.

Evidently the Justice Department has been unable to sell its litigation position within the executive branch, so it has come to the Ninth Circuit. The statute requires that "[s]tandards included in regulations . . . shall be consistent with the minimum guidelines and requirements issued by the Architectural and Transportation Barriers Compliance Board,"[2] called the "Access Board." The Access Board published a Notice of Proposed Rulemaking in 1999 that it was considering promulgating new regulations for "stadium-style motion picture theaters" because of the frequent

---

**1.** *See Lara v. Cinemark USA, Inc.*, 207 F.3d 783 (5th Cir.2000).

**2.** 42 U.S.C. § 12186(c).

placement of wheelchair spaces in the first few rows.[3]

The Access Board notes that "DOJ has asserted in attempting to settle particular cases" that the usual wheelchair placement should be changed to give wheelchair patrons sight lines "equivalent to or better than the viewing angles provided by 50 percent of the seats in the auditorium," by elevating the wheelchair seats to the stadium section.[4] Far from announcing that DOJ was right about what the existing regulation meant, the Access Board announced that "the Board is considering whether to include specific requirements in the final rule that are consistent with DOJ's interpretation."[5] The Board notes the desirability of affording better sight lines to wheelchair patrons, but also notes that "design professionals have expressed some uncertainty about how to measure their compliance."[6] Balancing these concerns, "the Board is proposing to amend the guidelines to include specific technical provisions" governing sight lines.[7]

It is striking to contrast the just approach of the Access Board with the unjust approach of the majority decision. When and if the Access Board promulgates a regulation, architects will know before a movie theater is built how they must design it, and owners of existing theaters will know what reconstruction they must perform. By contrast, under today's decision, retroactive as judicial decisions generally are, thousands of movie theaters will discover that they are out of compliance with the law, and must destroy facilities built in compliance with the law according to the best knowledge of design professionals at the time. They must rebuild them to satisfy the architectural inferences design professionals will have to draw from today's opinion. Those inferences are obscure and debatable. Though I could come up with a scheme that I think could satisfy the implications of the majority opinion, I am not sure that it would satisfy the majority, and I am entirely unable to say what is the least expensive design that would satisfy the majority. If a judge on the panel cannot say just what is required, how can a movie theater owner? It is irresponsible to impose on the country a decision that will require of an industry so much reconstruction, without clear guidance on what must be done.

We ought to leave the Access Board process alone. If the Access Board adopts the Justice Department's position or something like it, the requirements will be clear, precise and prospective. Though any result might be subject to substantive objections (it is hard to justify a gloss on the statute that requires wheelchair users to have a *better* view than half or more of the seats), at least the result would be obtained after a fair process. Regulating movie theater architecture retroactively by vague judicial fiat is unjust.

The Access Board implicitly acknowledges that the Justice Department is arguing for creation of new law rather than a permissible construction of existing regulations. And the structure of the existing regulations and the timing of the regulation at issue compel this conclusion. The "accessibility guidelines" surrounding § 4.33.3—the one covering lines of sight— are written with great precision, e.g., telephone cord length must be at least 29″,[8] and wheelchair seating knee clearance at tables and counters must be "at least 27 in

---

3. 64 Fed.Reg. 62,248 62,278 (Nov. 16, 1999).

4. *Id.*

5. *Id.*

6. *Id.* at 62,277.

7. *Id.*

8. 28 C.F.R. Part 36, App. A, § 4.31.8.

(685 mm) high, 30 in (760 mm) wide, and 19 in (485 mm) deep."[9] Where a regulation tells movie architects and owners to the millimeter how they must construct knee space, the use of the vague term "comparable" must be looser by intent. It is unreasonable to infer from the regulation on the next page, "lines of sight comparable to those for members of the general public,"[10] something like the "better than 50%" of the seats rule that the Justice Department has suggested.

The majority is rightly troubled by the notion of a wheelchair ghetto in one part of the movie theater with sight lines worse than those of the other patrons. But that concern is a chimera, because the regulation already speaks to that issue. It says that "[w]hen the seating capacity exceeds 300, wheelchair spaces shall be provided in more than one location,"[11] and in all theaters, the wheelchair seating has to be an "integral part" of the seating with "lines of sight comparable to those for members of the general public." That means that in the smaller theaters, it is permissible to group the wheelchair seating rather than to distribute it throughout the theater, but that it has to be part of the general seating footprint rather than separated, and the lines of sight cannot be substantially different from those of seats available for the general public. Under the existing regulations, there cannot be a wheelchair ghetto out of the way, behind a post, or off to the side.

The regulation at issue, in contrast with the highly specific (to the millimeter) requirements of the surrounding regulations, requires that wheelchair areas be "an integral part" of the fixed seating plan, that

they "adjoin an accessible route" that also serves as an emergency exit, that they be adjacent to "companion" seating, and that they have "lines of sight comparable to those for members of the general public."[12] The majority opinion disregards all the other requirements that give context to the lines of sight requirement, such as the access and emergency exit requirements. These other requirements complicate any construction plans. The "integral part" requirement prohibits a separate and noncontiguous wheelchair ghetto, the companion seating provision prohibits separation of the disabled from friends and family, and the access route provision assures that the disabled can get in and out of the movie theater conveniently and safely (which may require that they be in the flat area in front).

What this case is really all about is the meaning of the word "comparable" in the "lines of sight" regulation. The regulation uses "comparable" in its sense of "similar or equivalent."[13] The question is, "comparable to what?" Evidently the Justice Department position is that "comparable" means "equivalent to or better than the viewing angles ... provided by 50 percent of the seats."[14] That may or may not be a reasonable imposition on theater owners, but it is not a natural usage of the word "comparable." "Comparable" does not mean "better than." It means "similar or equivalent." And why "50 percent of the seats?" Why not just "comparable to the viewing angles provided by non-wheelchair seating?" That would be a more natural interpretation of the word "comparable."

9. *Id.* at § 4.32.3.

10. *Id.* at § 4.33.3.

11. *Id.*

12. 28 C.F.R. Part 36, App. A, § 4.33.3.

13. *The American Heritage Dictionary* 300 (2d ed. 1982).

14. 64 Fed.Reg. 62,248–62,278 (Nov. 16, 1999).

Viewing angles differ for every seat in the house. As the Fifth Circuit noted, preferences are highly subjective, and people's preferences differ.[15] Some people like to sit in front, for maximum size of picture and stereo effect of the sound, and to avoid distractions from people in front of them. Some people like to sit in back, for the greater height and sense of separation from the picture. Some like the aisles, so they can get out easily to go to the bathroom or the popcorn stand. Some like the center, so they won't be distracted by the people who get up during the movie to go the bathroom or the popcorn stand. The lines of sight for the wheelchair seats cannot be comparable to all of these, without requiring the scattering of wheelchair seating that the 300–seat provision expressly avoids requiring in small theaters. The wheelchair seats up front are comparable (though as a matter of geometry a line of sight will not be identical to any particular other seat) to the other seats up front, preferred by those patrons who like to sit up front. If the seats up front, or in the back, were uniformly considered undesirable, theaters would have to charge less for them. They don't.

The Fifth Circuit solves this problem by interpreting the line of sight requirement as requiring an unobstructed view.[16] Whether we adopt precisely that reading or not, the regulation plainly does not mean what the Justice Department says it means (and what the majority opinion may or may not imply that it means): "equal to or better than 50 percent of the seats," whatever "better" may mean.

The Fifth Circuit went the other way from the majority in *Lara*, so now we have a circuit conflict. Theater owners in the Ninth Circuit have no guidance from the majority on how to build their theaters,

other than to stop doing what they are doing now. A purportedly uniform federal regulation now means something different in the Ninth Circuit from what it means in the Fifth.

Perhaps responding to my concern that a theater owner cannot read the majority opinion and figure out what to do to obey the law, the majority says that the viewing angle for wheelchair seating has to be "within the range of angles offered to the general public." This is evidently the meaning the majority attributes to the words of the regulation, "lines of sight comparable to those for members of the general public."[17] But the majority's gloss on the regulation, besides being something different from what the regulation says, is no help at all to theater owners trying to comply with the law. "[W]ithin the range of angles" does not speak with more clarity than "comparable."

The seating in the theaters before us already does provide wheelchair viewing angles "within the range of angles offered to the general public," so the words the majority uses cannot mean what they say, since the majority directs summary judgment against the theaters. The affidavits establish that because wheelchairs cannot roll up steps, the theaters provide spaces for them "on a flat portion of each auditorium, near the entranceways and exits, in front of the tiered seats, amidst seating for the general public." The wheelchair spaces in the challenged theaters "are in one or more of the first five rows." The regular seats right next to the wheelchair spaces provide viewing angles "within the range" of the general seating. The vertical angles are identical. Where there are regular seats to the left and right of a

15. *Lara*, 207 F.3d at 789.

16. *Id.*

17. *Id.*

wheelchair seat, it is a geometric certainty that the angle of view from the wheelchair seat will be greater than the angle from one, and less than the angle from the other, so that it is necessarily "within the range of angles" of the two adjacent seats. Of course the theater cannot command the manufacturers of wheelchairs to give them all the same reclining angles as theater seats, and there may be important medical reasons why some wheelchair users would not want that, so to the extent the majority is alluding to its neck-craning concern, that is out of the theater's control. The wheelchair manufacturer and purchaser in substantial part control the vertical viewing angle, and the wheelchair space provided by the movie theater controls the horizontal angle. Those who use wheelchair spaces in a movie theater bring their own chairs.

All the majority tells us with any clarity is that it is not satisfied with the existing state of affairs, where wheelchair patrons sit in the front rows. But architects and theater owners need to know, not only what the Ninth Circuit rejects, but what construction and reconstruction will be acceptable. That is why the regulations delimit knee space to the millimeter. Judicial opinions cannot be written that way, which is a good reason why we should not try to rewrite the regulations as the majority does. The majority admits that stadium seating was a "factual scenario not expressly anticipated at the time the regulation was promulgated," [18] yet construes the regulation to address it. If the regulation did not contemplate stadium seating, the only fair inference is that it did not provide specially for it. Obviously, there was wheelchair seating before stadium seating, and if the regulations did not prohibit a wheelchair section in the front of the theater before, it is impossible to justify a construction that the very same regulation

prohibits the very same wheelchair seating, with identical angles of view, after stadium seating came into use.

The least the majority could do in its retroactive legislative effort is offer a holding that can be translated into a floorplan. Today's holding cannot, not least because in theaters where there are seats on both sides of the wheelchair spaces, the result treats as violated a rule that is mathematically certain to have been complied with. What we should do, of course, is conclude as the Access Board evidently has, that the regulation does not now mean what the Justice Department wants it to mean. We know perfectly well that the Access Board is addressing wheelchair spaces and stadium seating, and there is no justification for jumping in front of them.

---

18. Majority Opinion at 1133.