**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TINA BAUGHMAN,
        *Plaintiff-Appellant,*

v.

WALT DISNEY WORLD COMPANY,
        *Defendant-Appellee.*

No. 10-55792

D.C. No.
8:07-cv-01108-
CJC-MLG

OPINION

Appeal from the United States District Court
for the Central District of California
Cormac J. Carney, District Judge, Presiding

Argued and Submitted
January 11, 2012—Pasadena, California

Filed July 18, 2012

Before: Alex Kozinski, Chief Judge, Stephen Reinhardt and
William A. Fletcher, Circuit Judges.

Opinion by Chief Judge Kozinski

---

**COUNSEL**

David E. Geffen, David Geffen Law Firm, Santa Monica, California, for appellant Tina Baughman.

Daniel F. Fears, Daniel L. Rasmussen and Daniel F. Lula, Payne & Fears LLP, Irvine, California, for appellee Walt Disney World Company.

Thomas E. Perez, Assistant Attorney General, Jennifer L. Eichhorn and Gregory B. Friel, United States Department of Justice, Civil Rights Division, Washington, D.C., for amicus curiae United States.

---

**OPINION**

KOZINSKI, Chief Judge:

Segways at Disneyland? Could happen.

**Facts**

Tina Baughman suffers from limb girdle muscular dystrophy, which makes it difficult for her to walk or stand from a seated position. Baughman nevertheless hoped to fulfill her daughter's eighth-birthday wish: a visit to the happiest place on earth. She contacted Disneyland to explain her physical limitations and request permission to use a Segway, a two-

wheeled mobility device operated while standing. *See* Appendix 1. Disney's policy is to allow wheelchairs and motorized scooters; "two-wheeled vehicles or devices," like bicycles and Segways, are prohibited. Disney refused to make an exception for Baughman.

Baughman sued Disney under the Americans with Disabilities Act ("ADA"), claiming that Disney denied her full and equal access to Disneyland. The district court held that Baughman was judicially estopped from claiming she can't use a motorized wheelchair, so there was no genuine issue of material fact as to whether it was "necessary" for Baughman to use a Segway to visit Disneyland. It therefore granted summary judgment for Disney.

## Discussion

## I.   Judicial Estoppel

**[1]** In three prior lawsuits, Baughman claimed that "she has a physical impairment which causes her to rely upon a power scooter or wheelchair for her mobility." Now she claims that she must use a Segway because using a wheelchair is "impractical, painful, and difficult." "[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position . . . ." *New Hampshire* v. *Maine*, 532 U.S. 742, 749 (2001) (internal quotation marks omitted). This doctrine is known as judicial estoppel and its purpose is to protect the integrity of the judicial process by "prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Id.* at 749-50 (internal quotation marks and citations omitted).

Judicial estoppel is imposed at the discretion of the district court. *Id.* at 750. In considering whether the district court abused its discretion, we look at several factors, including: (1)

Is the party's later position "clearly inconsistent with its ear-lier position"? (2) Did the party succeed in persuading a court to accept its earlier position, creating a perception that the first or second court was misled? and (3) Will the party seek-ing to assert an inconsistent position "derive an unfair advan-tage or impose an unfair detriment on the opposing party"? *Id.* at 750-51 (internal quotation marks omitted).

**1.** In three prior lawsuits, Baughman claimed that she relied on a wheelchair or scooter for her mobility. Assertions in her current complaint that she has "never used" and "do[es]n't need" a wheelchair clearly can't be reconciled with the earlier claims. Baughman presents no evidence that her condition has changed so that she can no longer use a wheelchair or scooter. Instead, she argues that she's not bound by her previous state-ments because she didn't make them under oath.

**[2]** But, as the Supreme Court has explained, judicial estoppel prevents a party from changing its "*position* in a legal proceeding." *New Hampshire*, 532 U.S. at 749 (empha-sis added). Positions need not be taken under oath. The point is to "prevent[ ] a party from asserting a *claim* in a legal pro-ceeding that is inconsistent" with a previous claim. 18 James Wm. Moore et al., Moore's Federal Practice § 134.30, p. 134-63 (3d ed. 2012) (emphasis added). Indeed, the claim might not be factual at all. We've applied the doctrine to prevent a party from making a legal assertion that contradicted its ear-lier legal assertion. *Wagner* v. *Prof'l Eng'rs in Cal. Gov't*, 354 F.3d 1036, 1044 (9th Cir. 2004).

**[3]** That Baughman's earlier statements weren't made under oath doesn't matter. What matters is that she pressed a claim in the earlier lawsuits that is inconsistent with the posi-tion she's taking in our case. That is all that's needed to sat-isfy this factor.

**2.** The second *New Hampshire* factor—that one of the courts has been misled—is often dispositive. *See Interstate*

*Fire & Cas. Co.* v. *Underwriters at Lloyd's, London*, 139 F.3d 1234, 1239 (9th Cir. 1998). For a court to be misled, it need not itself adopt the statement; those who "induce[ ] their opponents to surrender have prevailed as surely as persons who induce the judge to grant summary judgment." *See Rissetto* v. *Plumbers & Steamfitters Local 343*, 94 F.3d 597, 604-05 (9th Cir. 1996) (internal quotation marks omitted). When a party settles a case involving false allegations or claims, the court is deemed to have been misled. This is because it's the coercive power of the court—the judgment it might render if the case is litigated to its conclusion—that's the driving force behind such settlements.

**[4]** Baughman's statements in the earlier cases were not peripheral or immaterial; they were central to her claims. She filed complaints alleging that she couldn't access the defendants' facilities by using a wheelchair, and the lawsuits resulted in favorable settlements. If Baughman is now allowed to claim that she cannot use a wheelchair, either the earlier courts or we will have been misled. We don't allow parties to "play[ ] fast and loose with the courts" by adopting such contradictory positions. *Hamilton* v. *State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001) (internal quotation marks omitted).

**[5]** Baughman also claims she wasn't aware of those representations in her earlier complaints, which were drafted by her lawyer. But Baughman's personal knowledge doesn't matter. What matters is that she derived a benefit from an earlier lawsuit where material inconsistent representations were made on her behalf. So long as those judgments or settlements stand, Baughman is bound by the representation she made during the course of the litigation.

**3.** Finally, if Baughman can assert that she's never used, and can't use, a wheelchair, her ADA claim in our case could be significantly stronger, giving her an unfair advantage over her opponent.

**[6]** Each of the *New Hampshire* factors supports the district court's ruling that Baughman is estopped from claiming she can't use a motorized wheelchair or scooter. We analyze her ADA claim based on the presumption she can.

## II. ADA Claim

**[7]** Congress enacted the ADA "to remedy widespread discrimination against disabled individuals." *PGA Tour, Inc.* v. *Martin*, 532 U.S. 661, 674 (2001). Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the *full and equal enjoyment* of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation . . . ." 42 U.S.C. § 12182(a) (emphasis added). Discrimination is defined, in part, as "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are *necessary* to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities . . . ." § 12182(b)(2)(A)(ii) (emphasis added); *see also Martin*, 532 U.S. at 683 n.38.

The district court held that Disney is not required to modify its policy because it permits motorized wheelchairs or scooters. Disney argues vigorously in support of the district court's judgment that "necessary" means only one thing: can't do without. Because Baughman *can* access Disneyland by using a wheelchair or scooter, a Segway isn't "necessary" for her to use the park. QED.

Read as Disney suggests, the ADA would require very few accommodations indeed. After all, a paraplegic *can* enter a courthouse by dragging himself up the front steps, *see Tennessee* v. *Lane*, 541 U.S. 509, 513-14 (2004), so lifts and ramps would not be "necessary" under Disney's reading of the term. And no facility would be required to provide wheelchair-accessible doors or bathrooms, because disabled individuals could be carried in litters or on the backs of their

friends. That's not the world we live in, and we are disappointed to see such a retrograde position taken by a company whose reputation is built on service to the public.

**[8]** Disney's (and the district court's) error lies in fixating on a single word in the statute rather than reading all of the relevant words together. *See FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-33 (2000). The ADA guarantees the disabled more than mere access to public facilities; it guarantees them "full and equal enjoyment." 42 U.S.C. § 12182(a). What this means is illustrated by cases such as *Fortyune* v. *American Multi-Cinema, Inc.*, 364 F.3d 1075, 1085 (9th Cir. 2004), where we held that a theater was required to provide wheelchair seating for the disabled individual *and* an adjacent seat for his wife. The attendant seat was obviously not necessary for Fortyune to see the movie, but moviegoers expect to sit with their friends and family during the show; their enjoyment is diminished if they are forced to sit apart. "Because Fortyune require[d] an attendant to *enjoy* the viewing of a film, the modification that he requested, *i.e.*, that [the theater] ensure that his companion could be seated next to him, was necessary." *Id.* at 1083 (emphasis added).

**[9]** Public accommodations must start by considering how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience. *See Spector* v. *Norwegian Cruise Line Ltd.*, 545 U.S. 119, 128-29 (2005). For example, the movie theaters in *Oregon Paralyzed Veterans of America* v. *Regal Cinemas, Inc.*, 339 F.3d 1126, 1127-28 (9th Cir. 2003), provided seating for wheelchair-bound patrons only in the front rows of the theater. We found it "simply inconceivable that this arrangement could constitute 'full and equal enjoyment' of movie theater services by disabled patrons" because it required them "to crane their necks and twist their bodies in order to see the screen, while non-disabled patrons [had] a wide range of comfortable viewing locations from which to choose." *Id.* at 1133.

We rejected the notion that "[n]o matter where in the theater the seats are, and no matter how sharp the viewing angle, so long as there is no physical object standing between the disabled patron and the screen" the theaters satisfied the ADA. *Id.* We held that theaters had to provide disabled patrons an experience comparable to that of able-bodied patrons. *Id.*

**[10]** Facilities are not required to make any and all possible accommodations that would provide full and equal access to disabled patrons; they need only make accommodations that are reasonable. In deciding what's reasonable, facilities may consider the costs of such accommodations, disruption of their business and safety. But they must also take into account evolving technology that might make it cheaper and easier to ameliorate the plight of the disabled. In the past, it might have been enough for a theme park to permit only non-powered wheelchairs. As technology made motorized wheelchairs and scooters cheaper, safer and more reliable, our expectations of what is reasonable changed—as Disney recognizes. But technological advances didn't end with the powered wheelchair. As new devices become available, public accommodations must consider using or adapting them to help disabled guests have an experience more akin to that of non-disabled guests.

**[11]** The modification Baughman seeks is entirely consistent with our caselaw. She claims that she has difficulty standing up from a seated position, so the Segway—which allows her to remain standing—makes it easier for her to visit Disneyland's many attractions, concessions and facilities. She also claims that using a Segway allows her to be at eye-level with other guests and staff, rather than having everyone look down at her. Disney doesn't dispute Baughman's claim that using a motorized wheelchair or scooter would require her to stand and sit many times during her visit, or that doing so would be painful for her. Nor does Disney dispute that Baughman would feel more comfortable and dignified using a Segway. Disney simply takes the position that, even if Baughman's access is made "uncomfortable or difficult" by

its policies, any discomfort or difficulty she may suffer is too darn bad. Supplemental Br. of Appellee 5. Disney is obviously mistaken. If it can make Baughman's experience less onerous and more akin to that enjoyed by its able-bodied patrons, it must take reasonable steps to do so. *See Regal Cinemas, Inc.*, 339 F.3d at 1133.

Our conclusion is supported by regulations recently promulgated by the Department of Justice ("DOJ"), which is charged with administering the ADA. *See Bragdon* v. *Abbott*, 524 U.S. 624, 646 (1998); 28 C.F.R. § 36.311. The regulations identify two classes of mobility devices: (1) wheelchairs and manually powered mobility aids and (2) other power-driven mobility devices. § 36.311. According to the DOJ, Segways fall into the second category. § 36, app. A, at 726.

**[12]** When faced with an individual who uses a device from the second category, the public accommodation must "make reasonable modifications" to permit the device unless it can demonstrate that the device can't be operated "in accordance with legitimate safety requirements." § 36.311(b)(1). The regulation discusses Segways at length, concluding "that in the vast majority of circumstances" public accommodations will have to admit them. § 36, app. A, at 726.

**[13]** "As the agency directed by Congress to issue implementing regulations, to render technical assistance explaining the responsibilities of covered individuals and institutions, and to enforce Title III in court, the Department's views are entitled to deference." *Bragdon*, 524 U.S. at 646 (internal citations omitted); *see also* 42 U.S.C. § 12186(b). Where Congress has given "express delegation of authority to [an] agency to elucidate a specific provision of [a] statute by regulation," such regulation is "given controlling weight unless [it's] arbitrary, capricious, or manifestly contrary to the statute." *Chevron, U.S.A., Inc.* v. *Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984).

Disney scoffs at the regulation, claiming it conflicts with precedent. It argues that in *Martin*, 532 U.S. at 682, the Supreme Court adopted Disney's strict meaning of "necessary," precluding the Justice Department from adopting a broader definition by way of regulation. According to Disney, the *Martin* Court held that a requested modification under Title III of the ADA isn't necessary, "even when access to the public accommodation may be 'uncomfortable or difficult' for the plaintiffs without it, so long as access is not '*beyond their capacity*. In such cases, an accommodation might be reasonable but not necessary.'" Supplemental Br. of Appellee 5 (quoting *Martin*, 532 U.S. at 682 (emphasis added)) (internal citation omitted).

But the issue presented in *Martin* was whether the requested modification—using a golf cart—fundamentally altered the nature of the PGA Tour, which required golfers to walk. *Martin*, 532 U.S. at 682-91. The Court had no occasion to rule on whether the requested modification was necessary "[g]iven the concession by [the public accommodation] that the modification sought [was] reasonable and necessary." *Id.* at 683 n.38. *Martin* offers Disney no help, and Disney's other arguments that the regulation is invalid border on the absurd.

**[14]** We do not hold that Disney must permit Segways at its theme parks. It might be able to exclude them if it can prove that Segways can't be operated safely in its parks. Section 36.311(b) lists several factors to consider in determining whether a device can be used in a particular facility, including the size, weight and speed of the device; the volume of pedestrian traffic in the facility; and whether legitimate safety requirements can be established to ensure safe operation of the device. § 36.311(b)(2). Disney might, for example, permissibly require Segways to travel only as fast as motorized wheelchairs. But any safety requirements Disney imposes "must be based on actual risks and not on mere speculation, stereotypes, or generalizations about individuals with disabilities." 28 C.F.R. § 36.301(b).

New technology presents risks as well as opportunities; we must not allow fear of the former to deprive us of the latter. We have every confidence that the organization that, half a century ago, brought us the Carousel of Progress and Great Moments with Mr. Lincoln can lead the way in using new technology to make its parks more welcoming to disabled guests. As the man who started it all said, "Disneyland will never be completed as long as there is imagination left in the world." *Walt Disney, 65, Dies on Coast; Founded an Empire on a Mouse*, N.Y. Times, Dec. 16, 1966, at 40.

**REVERSED AND REMANDED.**

*Appendix 1*



**ER 564**.