**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-1725

J.D., by his father and next friend, Brian Doherty,

Plaintiff − Appellant,

v.

COLONIAL WILLIAMSBURG FOUNDATION,

Defendant – Appellee.

------------------------------

NATIONAL DISABILITY RIGHTS NETWORK; DISABILITY LAW CENTER
FOR VIRGINIA; SCOTT HAYES; VIRGINIA FOOD ALLERGY ADVOCATES,

Amici Supporting Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at
Newport News.  Rebecca Beach Smith, District Judge.  (4:17-cv-00101-RBS-RJK)

Argued:  January 29, 2019                    Decided:  May 31, 2019

Before WILKINSON, DIAZ, and FLOYD, Circuit Judges.

Vacated and remanded by published opinion.  Judge Diaz wrote the majority opinion, in
which Judge Floyd joined.  Judge Wilkinson wrote a dissenting opinion.

**ARGUED:** Mary Caroline Vargas, STEIN & VARGAS, LLP, Washington, D.C., for
Appellant.  Dana Lewis Rust, MCGUIREWOODS LLP, Richmond, Virginia, for

Appellee.  **ON BRIEF:** Robert W. McFarland, E. Rebecca Gantt, Norfolk, Virginia, Micah B. Schwartz, MCGUIREWOODS LLP, Richmond, Virginia, for Appellee.  Kerry M. Chilton, Steven M. Traubert, Zachary S. DeVore, DISABILITY LAW CENTER OF VIRGINIA, Richmond, Virginia, for Amici Disability Law Center of Virginia and National Disability Rights Network.  Ellen M. Saideman, LAW OFFICE OF ELLEN SAIDEMAN, Barrington, Rhode Island; Theodore R. Debonis, Karen C. Baswell, Farrell A. Brody, Lidia H. Rezende, CHAFFETZ LINDSEY LLP, New York, New York, for Amici Scott Hayes and Virginia Food Allergy Advocates.

DIAZ, Circuit Judge:

J.D. is a child on a strict gluten-free diet. In keeping with this diet, he attempted to bring a homemade, gluten-free meal into a restaurant while on a school field trip to Colonial Williamsburg. The restaurant refused to let him do so and offered instead to prepare him a gluten-free meal. But J.D. declined because he didn't trust the restaurant to safely prepare the meal to his specific needs. Ultimately, J.D. chose to eat his homemade meal outside and apart from the rest of his classmates.

After these events, J.D., by his father and next friend, sued the Colonial Williamsburg Foundation (which owns and operates the restaurant) for violating the Americans with Disability Act, the Rehabilitation Act, and the Virginians with Disabilities Act. J.D. alleged that he is a person with a disability, and that Colonial Williamsburg discriminated against him by excluding him from the restaurant and by refusing to modify its policy against outside food. The district court granted summary judgment to Colonial Williamsburg. For the reasons that follow, we vacate and remand for further proceedings.

I.

A.

J.D. is an 11-year-old boy who suffers from several health problems.[1] J.D. experiences a host of symptoms when he ingests gluten, including significant constipation,

---

[1] We recite the facts in the light most favorable to J.D., as the non-moving party. *See Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 324–25 (4th Cir. 2012).

abdominal pain, foot pain and numbness, cognitive impairment, elevated liver enzymes, and temporary loss of consciousness. According to J.D.'s primary physician, J.D.'s family history is positive for either celiac disease or non-celiac gluten sensitivity.

Celiac disease is an autoimmune disorder where the ingestion of gluten, even in trace amounts, causes damage to the small intestine. Symptoms include fatigue, abdominal pain, constipation, and cognitive impairment. Untreated, celiac disease can lead to additional serious health problems, including intestinal cancer, short stature, liver disease, and nervous system disorders such as seizures and migraines. Non-celiac gluten sensitivity is a disorder with similar symptoms.

The only medically accepted treatment for celiac disease or non-celiac gluten sensitivity is a strictly gluten-free diet. J.D.'s physician expressed his medical opinion that "a gluten free diet is medically necessary for J.D." J.A. 165. And J.D.'s parents testified that his health significantly improved once on a strictly gluten-free diet.

However, when J.D. "accidentally ingests gluten, even in trace amounts, his symptoms come crashing back." J.A. 111. According to his parents, J.D. has had adverse reactions when eating out at several restaurants. For example, during a family visit to Disney World, J.D.'s parents spoke with a restaurant manager, who went through an "exhaustive list of the protocols" that would be used to ensure a gluten-free meal. *Id.* at 289. J.D. ate a gluten-free pizza that came out on a different colored tray, with allergy stickers on it, and was carried by the manager. A few days later, J.D. experienced symptoms consistent with having ingested gluten. His family later learned that J.D. had in fact been served a wheat crust, not a gluten-free one.

4

On other occasions, J.D. and his family frequented a restaurant that represented it could prepare gluten-free meals. J.D. would order gluten-free items from the menu, but after each visit, his family noticed that J.D. wasn't feeling well and showed signs of having ingested gluten. They didn't suspect the restaurant, however, because they had been assured of the gluten-free protocols in place. But on their last visit to the restaurant, they noticed a regular noodle in the purportedly gluten-free pasta.

Following these and other incidents, J.D.'s parents resolved to provide medically safe food to J.D. To that end, they regularly prepare his food and pack separate tableware to ensure that he can participate in school parties, celebrations, and meals to the greatest extent possible. Although there are some restaurants that his parents still trust, in general, they no longer eat out as a family due to the risk of gluten exposure.

B.

This case has its genesis in a school field trip. On May 11, 2017, J.D. and his classmates, accompanied by teachers and parent chaperones (including J.D.'s father) traveled to Colonial Williamsburg. Colonial Williamsburg bills itself as a "living-history museum" consisting of original and reconstructed buildings from the 18th century. The historic area includes Shields Tavern, a restaurant owned and operated by the Colonial Williamsburg Foundation, which offers guests a traditional, 18th-century experience with costumed actors and musicians. The itinerary for the trip included dinner at Shields Tavern.

Shields Tavern has a policy against allowing outside food into its restaurant. This policy is subject to two general exceptions: (1) parents may bring baby food or snacks for

5

infants and toddlers, and (2) patrons may bring cakes and wine for events subject to a plating and corkage fee. Shields Tavern also appears to allow outside food at the discretion of the manager.

Months before the trip, J.D.'s father informed the school that he and J.D. wouldn't be eating at any of the restaurants but would instead bring their own food. Nothing in the record indicates that this message was relayed to Shields Tavern. On the contrary, an invoice from Colonial Williamsburg shows that the school placed an order for two gluten-free meals at Shields Tavern. The parties dispute whether these meals were intended for J.D. and his father.[2]

When J.D. and his father arrived at Shields Tavern, they sat down at a two-person table. J.D's father informed a waitress not to bring out any food for them.[3] He then unpacked a cooler filled with plates, cups, and utensils, and began making a gluten-free chicken sandwich. Another waitress told J.D.'s father that he couldn't bring in outside food because it was a health code violation.[4] J.D.'s father asked to speak to the manager,

---

[2] There is no evidence that J.D.'s father adheres to a gluten-free diet.

[3] J.D.'s father did eat a salad that had been delivered to the table before he arrived.

[4] The Virginia health code prohibits "[f]ood prepared in a private home" from being "used or offered for human consumption in a food establishment unless the home kitchen is inspected and regulated by the Virginia Department of Agriculture and Consumer Services." 12 Va. Admin. Code § 5-421-270(B). The code also requires food that is "unsafe" or "contaminated" be "rendered unusable and discarded." *Id.* § 5-421-940(A), (C).

6

who confirmed the policy, and insisted that they would have to eat their food outside. The head chef soon arrived and offered to prepare a gluten-free meal for J.D.[5]

At this point, J.D. and his father were left with three options: hope for the best and accept the restaurant's offer of a gluten-free meal, stay inside and not eat, or eat the prepared meal outside. As J.D. began to cry, his father packed up the prepared meal and followed a server outside to the picnic tables behind Shields Tavern. J.D. and his father ate outside for 20 or 30 minutes before returning to the restaurant.

## C.

J.D., by his father and next friend, filed suit against the Colonial Williamsburg Foundation alleging violations of Section 504 of the Rehabilitation Act, Title III of the Americans with Disabilities Act ("ADA"), and the Virginians with Disabilities Act. He alleges that Colonial Williamsburg discriminated against him by excluding him from Shields Tavern and by failing to modify its policy against outside food.

Following discovery, Colonial Williamsburg moved for summary judgment. The district court referred the motion to a magistrate judge, who recommended granting it. The magistrate judge found that there was a genuine dispute of material fact as to whether J.D. is disabled within the meaning of the ADA. But the judge ultimately recommended

---

[5] According to Colonial Williamsburg, the head chef had already prepared the gluten-free meals based on the order placed by the school. J.D.'s father testified that the meals were not yet prepared and that the chef offered to prepare them on the spot. He alleged he did not trust the Tavern to be able to prepare gluten-free meals after preparing fried chicken meals for the other guests. The district court properly viewed these facts in the light most favorable to J.D.

7

granting summary judgment because J.D. didn't meet his burden to show that he was discriminated against because of his disability.

The district court adopted the magistrate judge's recommendation and granted summary judgment to Colonial Williamsburg. The court also awarded costs to Colonial Williamsburg as the prevailing party. This appeal followed.

## II.

"We review de novo a district court's summary judgment order." *Reyazuddin v. Montgomery County*, 789 F.3d 407, 413 (4th Cir. 2015). In doing so, we apply the same legal standards as the district court, viewing all facts and drawing all reasonable inferences "in the light most favorable to the non-moving party." *Dulaney*, 673 F.3d at 330. We do not weigh conflicting evidence or make credibility determinations. *Reyazuddin*, 789 F.3d at 413. If there are genuine issues of material fact that can only be resolved by a fact-finder, then the motion for summary judgment must be denied. *Id.* "A genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party." *Dulaney*, 673 F.3d at 330.

In this case, we view the evidence under the legal standards set forth in the ADA.[6] Congress enacted the ADA "to remedy widespread discrimination against disabled

---

[6] For purposes of summary judgment, we can analyze the ADA claim together with the claims brought under the Rehabilitation Act and the Virginians with Disabilities Act. *See Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012) ("To the extent possible, we construe the ADA and Rehabilitation Act to impose similar requirements. Thus, despite the different language these statutes employ, they require a

8

individuals, " *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001), and to "provide clear, strong, consistent, enforceable standards" addressing that discrimination. 42 U.S.C. § 12101(b)(2). Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a).

To prevail under Title III of the ADA, a plaintiff must show that: (1) he is disabled within the meaning of the ADA; (2) the defendant owns, leases, or operates a place of public accommodation; and (3) the defendant discriminated against him because of his disability. *See Ariz. ex rel. Goddard v. Harkins Amusement Enters., Inc.*, 603 F.3d 666, 670 (9th Cir. 2010); *Camarillo v. Carrols Corp.*, 518 F.3d 153, 156 (2d Cir. 2008); *see also Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 502–03 (4th Cir. 2016) (laying out similar standards under Title II of the ADA).

The parties don't dispute the second element since restaurants are expressly designated places of public accommodation. *See* 42 U.S.C. § 12181(7)(B). Thus, we turn to consider the record evidence on whether J.D. is disabled, and whether Colonial Williamsburg discriminated against J.D. because of his disability.

---

plaintiff to demonstrate the same elements to establish liability. (citation omitted)); *Tyndall v. Nat'l Educ. Ctrs., Inc.*, 31 F.3d 209, 216 (4th Cir. 1994) ("The VDA standards for liability follow the standards established in the federal Rehabilitation Act of 1973 and adopted in the ADA.").

III.

The district court held that there was a genuine dispute of material fact as to whether J.D. is disabled, denying summary judgment to Colonial Williamsburg on this first issue. The ADA defines a "disability" in pertinent part as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). An impairment means "[a]ny physiological disorder or condition" that affects "one or more body systems," such as the neurological, digestive, or immune systems. 28 C.F.R. § 36.105(b)(1)(i). "[N]ot every impairment will constitute a disability within the meaning of this section," but it will meet the definition if "it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." *Id.* § 36.105(d)(1)(v). Eating is a major life activity. *Id.* § 36.105(c)(1)(i).

Here, the district court observed that the record is unclear regarding the nature and extent of J.D.'s impairment. For example, it's unclear whether J.D. has celiac disease or the less severe non-celiac gluten insensitivity, or for that matter which of his symptoms are actually caused or exacerbated by the ingestion of gluten. But viewing the facts in the light most favorable to the plaintiff, the court believed that J.D.'s impairment could qualify as a disability under the ADA.

Colonial Williamsburg argues that, even if J.D.'s gluten sensitivity causes all of the symptoms he claims, the district court erred in denying summary judgment on this issue because J.D. can simply avoid foods that contain gluten. As a result, his impairment doesn't "substantially limit" a major life activity. We disagree.

10

In considering whether an impairment substantially limits an individual in a major life activity, we construe the statutory text "broadly in favor of expansive coverage," keeping in mind that the language "is not meant to be a demanding standard." 28 C.F.R. § 36.105(d)(1)(i). This interpretation is consistent with the purpose of the ADA Amendments Act of 2008 ("ADAAA"), which was passed to "reinstat[e] a broad scope of protection to be available under the ADA." *Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 329 (4th Cir. 2014) (quoting Pub. L. No. 110–325, § 2(b)(1), 122 Stat. 3553). Furthermore, the ADAAA makes explicit that the "substantially limits" inquiry is to be made "without regard to the ameliorative effects of mitigating measures," such as "learned behavioral . . . modifications." 42 U.S.C. § 12101(4)(E)(i). Instead, we are to consider impairments in their "*unmitigated* state." *Rohr v. Salt River Project Agric. Improvement & Power Dist.*, 555 F.3d 850, 862 (9th Cir. 2009).

Here, we agree with the district court that J.D.'s need to maintain a strict diet is a learned behavioral modification, which the court was prohibited from considering. In other words, the district court was required to consider the effects of J.D.'s impairment when he's not on a strict gluten-free diet. *See id.* ("[D]iabetes will be assessed in terms of its limitations on major life activities when the diabetic does *not* take insulin injections or medicine and does not require behavioral adaptations such as a strict diet."). As the district court observed, J.D. submitted extensive evidence about the serious consequences to his health when he ingests gluten. That J.D. can avoid these symptoms when he maintains a gluten-free diet is immaterial because it runs counter to the clear mandate of the ADAAA. For that reason, we also find unpersuasive those cases pre-dating the ADAAA that

11

considered such mitigating measures. *See, e.g.*, *Land v. Baptist Med. Ctr.*, 164 F.3d 423, 425 (8th Cir. 1999) (finding plaintiff's allergies did not constitute a disability because she could avoid peanut products).

To be sure, no one can eat whatever he or she desires without experiencing some negative health effects. Nonetheless, we must "permit those who are disabled because of severe dietary restrictions to enjoy the protections of the ADA." *Fraser v. Goodale*, 342 F.3d 1032, 1041 (9th Cir. 2003). The evidence here—which a jury may choose to credit or not—is that J.D. and his parents must remain vigilant because the ingestion of even a small amount of gluten may have serious consequences for J.D.'s health. Unlike a person with simple diet restrictions, J.D. says that he must monitor everything he eats. And unlike a person with simple diet restrictions, J.D. alleges that he doesn't enjoy much (if any) margin for error.

In short, the district court correctly determined that J.D. has raised a genuine dispute of material fact as to whether he is disabled within the meaning of the ADA.


IV.

We next consider whether Colonial Williamsburg discriminated against J.D. because of his disability. The ADA defines discrimination, in part, as:

> a failure to make *reasonable* modifications in policies, practices, or procedures, when such modifications are *necessary* to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would *fundamentally alter* the nature of such goods, services, [etc.].

12

42 U.S.C. § 12182(b)(2)(A)(ii) (emphases added).

The Supreme Court has explained that this provision "contemplates three inquiries": (1) whether the requested modification is "necessary" for the disabled individual; (2) whether it is "reasonable"; and (3) whether it would "fundamentally alter the nature" of the public accommodation. *Martin*, 532 U.S. at 683 n.38. The plaintiff bears the burden of proving that the requested modification is both necessary and reasonable; the defendant bears the burden of proving that the requested modification would be a fundamental alteration. *See Lamone*, 813 F.3d at 507–08; *A.L. ex rel. D.L. v. Walt Disney Parks & Resorts US, Inc.*, 900 F.3d 1270, 1292 (11th Cir. 2018). For each step, the ADA requires an "individualized inquiry" based on particular circumstances. *Martin*, 532 U.S. at 688.

In this case, the district court ultimately granted summary judgment on the "necessary" prong. The court determined that J.D.'s request to bring his homemade meal inside Shields Tavern was not a "necessary" modification under the ADA because the gluten-free meal offered by Shields Tavern would have provided J.D. with full and equal enjoyment of the restaurant. As a result, the district court declined to reach the reasonableness or fundamental alteration inquiries.

### A.

We begin by considering whether J.D's requested modification was necessary. In conducting this inquiry, courts have used a "like experience" standard, meaning that public accommodations must start by considering how their facilities are used by nondisabled guests and then must take necessary and reasonable steps to provide disabled guests with a "like experience." *A.L. v. Walt Disney*, 900 F.3d at 1296; *accord Argenyi v. Creighton*

13

*Univ.*, 703 F.3d 441, 451 (8th Cir. 2013); *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012). This approach is consistent with the ADA, which "guarantees the disabled more than mere access to public facilities; it guarantees them 'full and equal enjoyment.'" *Baughman*, 685 F.3d at 1135 (quoting 42 U.S.C. § 12182(a)).

Under this framework, the district court determined that Shields Tavern offered food and an 18th-century atmosphere to its guests. And, it concluded, Shields Tavern didn't deny J.D. a like experience because the restaurant would have prepared J.D. a gluten-free meal or would have allowed him to remain inside, enjoy the atmosphere, and eat his meal later. Thus, J.D.'s requested modification wasn't necessary for full and equal enjoyment of the restaurant.

On appeal, J.D. argues that the district court erred in not drawing factual inferences in his favor. Specifically, he contends the district court ignored his history of repeatedly getting sick when eating purportedly gluten-free meals prepared by commercial kitchens, which (he says) shows that he was at a significant risk had he accepted the gluten-free meal offered by Shields Tavern. We agree with J.D. that this testimony is crucial to determining whether his requested modification was necessary to ensure full and equal enjoyment of the restaurant.[7]

In *Martin*, the Supreme Court touched briefly in dicta on the meaning of "necessary" as it is used in the ADA. 532 U.S. at 682. The plaintiff, a professional golfer with a

---

[7] At the outset, we find unpersuasive Colonial Williamsburg's argument that J.D. could have simply eaten his meal later. We hardly see how sitting at a restaurant and not eating would have provided J.D. a like experience to that of his nondisabled peers.

14

degenerative circulatory disorder, requested a waiver of the PGA Tour's walking rule so he could ride his golf cart between the 18 holes at tournaments. *Id.* at 667–69. The Court accepted the PGA Tour's concession that the request was reasonable and necessary. The Court then explained: "Martin's claim thus differs from one that might be asserted by players with less serious afflictions that make walking the course uncomfortable or difficult, but not beyond their capacity. In such cases, an accommodation might be reasonable but not necessary." *Id.* at 682.

Two of our sister circuits have applied this statement regarding a plaintiff's capacity when analyzing the "necessary" prong. First, in *Argenyi*, a hearing-impaired medical student requested certain auxiliary aids and services. 703 F.3d at 450. Creighton University provided some accommodations, but Argenyi showed that he was still unable to follow lectures and classroom dialogue or successfully communicate with clinical patients. Thus, the evidence was that "aspects of his medical education" were not just "uncomfortable or difficult," but "beyond his capacity." *Id.* From such evidence, the Eighth Circuit said, a reasonable factfinder could determine that "Argenyi was denied an opportunity to benefit from medical school equal to that of his nondisabled classmates." *Id.* at 451.

Next, in *A.L. v. Walt Disney*, a group of individuals with severe autism challenged the sufficiency of the defendant's Disability Access Service program for its theme parks. 900 F.3d at 1296–98. Although Walt Disney allowed disabled plaintiffs to wait "virtually" for ride attractions without standing in line, the plaintiffs' evidence showed that they had no concept of time, could not defer gratification, and could not wait for rides. *Id.* Thus,

15

the evidence suggested that waiting for rides, even virtually, was "beyond the capacity of plaintiffs." *Id.* at 1296. Disney's existing program, said the Eleventh Circuit, "accommodate[d] the need to avoid physical lines, but not the need to avoid waits." *Id.* at 1297. This accommodation, then, "as good as it may be, still fail[ed] to address plaintiffs' alleged impairments." *Id.* at 1298. And because factual disputes existed as to those impairments, the court reversed the district court's grant of summary judgment on the "necessary" inquiry.

From these cases, we make two observations. First, the "necessary" inquiry requires an individualized inquiry into the plaintiff's capacity. Only after identifying the extent of the disability can we determine what accommodations are necessary for that "particular person's disability." *Martin*, 532 U.S. at 688. Here, J.D. alleges that he has a disability that prevents him from eating at restaurants. The evidence shows that J.D. repeatedly became sick when exposed to gluten at restaurants, whether from cross-contamination or from human error in following protocols. And this happened despite his parents' best efforts to ensure gluten-free meals. At summary judgment, viewing all facts and drawing all inferences in the light most favorable to J.D., we believe there is a genuine dispute on whether eating out is beyond J.D.'s capacity.

Second, where an accommodation is already in place, a plaintiff may still be entitled to something more if he can show that the accommodation does not account sufficiently

16

for his disability.[8] Here, Shields Tavern offered to accommodate J.D. by preparing him a gluten-free meal. The district court concluded that J.D.'s proposed modification was not necessary in light of this offer. We disagree.

That Shields Tavern has rigorous protocols for preparing gluten-free meals is commendable and may suffice as an accommodation for the majority of people with a gluten intolerance. Indeed, a jury might well reject J.D.'s evidence about the severity of his gluten intolerance, and thus find that the protocols at Shields Tavern were sufficient to account for his disability. But in our view, J.D. has put forth enough evidence as this stage to raise a genuine dispute of material fact as to whether the proposed accommodation sufficiently accounts for his disability.

In sum, the district court incorrectly overlooked the testimony that J.D. repeatedly became sick after eating purportedly gluten-free meals prepared by commercial kitchens. Until a jury resolves the disputes surrounding the nature and extent of J.D.'s disability, we cannot determine if the accommodation Shields Tavern offered, as good as it may be, fully accounted for his disability. Accordingly, we hold that the district court erred in finding as a matter of law that J.D.'s proposed modification was not necessary to have an experience equal to that of his classmates.

---

[8] *Compare Baughman*, 685 F.3d at 1136 (use of a Segway at a Disney was a necessary accommodation because it would be more comfortable and dignified than the wheelchairs provided), *with Coleman v. Phx. Art Museum*, No. CV 08-1833-PHX–JAT, 2009 WL 1097540, at *3 (D. Ariz. Apr. 22, 2009) (plaintiff's unique hip chair device was not necessary because he did not allege why the museum's proffered wheelchairs were insufficient to meet his needs).

B.

We turn now to the second inquiry under the ADA—that is, whether the requested modification is reasonable. Although the district court declined to reach this issue, we believe remand is unnecessary because "the record suffices to define the issues properly presented for our review and to permit their fair de novo review and resolution." *Hager v. Gibson*, 109 F.3d 201, 207 (4th Cir. 1997); *see also Charbonnages de France v. Smith*, 597 F.2d 406, 416 (4th Cir. 1979) ("Our analysis of the record before the district court convinces us that summary judgment was not warranted on any alternative basis there revealed and urged."). Here, we are satisfied that there exists a genuine dispute of material fact as to whether J.D.'s requested modification is reasonable.

Under the ADA, "[f]acilities are not required to make any and all possible accommodations that would provide full and equal access to disabled patrons," but "need only make accommodations that are reasonable." *Baughman*, 685 F.3d at 1135. A modification is reasonable if it is "reasonable on its face, *i.e.*, ordinarily or in the run of cases." *Halpern*, 669 F.3d at 464 (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 402 (2002)). Reasonableness is generally a fact-specific inquiry, *id.*, asking whether the specific modification is "reasonable under the circumstances." *Martin*, 532 U.S. at 688.

J.D. argues that his request is reasonable because he asked only that Shields Tavern let him eat his prepared meal. His request didn't cost anything; nor did it require Shields Tavern to do anything. Thus, he contends, the costs of the accommodation "d[id] not clearly exceed its benefits." *Lamone*, 813 F.3d at 508 (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 280 (2d Cir. 2003)).

18

J.D. also points to the fact that Shields Tavern allows parents to bring in outside food for toddlers and infants. The record also shows that (about two weeks after the events of this case) Colonial Williamsburg granted a similar accommodation to a child visiting another of its restaurants. After being notified (before the child's visit) of his severe allergies, Colonial Williamsburg determined that it could not accommodate him, and so allowed the child to eat a homemade meal in the restaurant. Although not dispositive, the fact that Colonial Williamsburg granted a similar request speaks directly to the reasonableness of J.D.'s request. *See Lamone*, 813 F.3d at 507–08 ("[A]lthough not determinative by itself, the fact that a version of [a tool used to facilitate voting by disabled voters] was voluntarily implemented by defendants [previously] . . . speaks to the reasonableness of using the tool.").

In response, Colonial Williamsburg says that J.D.'s request—bringing his own food into a restaurant without any advance notice—is unreasonable on its face. Colonial Williamsburg urges that the lack of notice would be disruptive to the restaurant's operations, and that the modification would present safety and liability risks for Shields Tavern. While each of these concerns certainly touches on the reasonableness of J.D.'s request, they are not dispositive.

Starting with notice, there is nothing in Title III of the ADA or the implementing regulations mandating prior notice at a place of public accommodation. And to the extent notice is even mentioned in other parts of the ADA, such as for accommodations in air and bus travel, the regulations emphasize that "advance notice requirements are generally undesirable" and should be used only when necessary to ensure the accommodation can be

19

made, such as when extra staffing is needed. 49 C.F.R. pt. 37, app. D, § 37.169 (bus travel); *see also* 14 C.F.R. § 382.27(a) (air carrier "must not require a passenger with a disability to provide advance notice in order to obtain services or accommodations" except as enumerated). What's more, even if a person fails to give the requisite advance notice under these regulations, the entity must still provide the accommodations if it can reasonably do so. *See* 49 C.F.R. pt. 37, app. D, § 37.169; 14 C.F.R. § 382.27(g).

Accordingly, we cannot say that J.D.'s request was unreasonable on its face merely because he failed to provide notice. Instead, the timing of the request is simply an additional fact to consider in the totality of circumstances. *See Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1051 n.16 (9th Cir. 1999) (late timing of request contributed to court's finding of unreasonableness); *Dee v. Md. Nat'l Capitol Park & Planning Comm'n*, No. CBD-09-491, 2010 WL 3245332, at *6 (D. Md. Aug. 16, 2010) (30 minutes' notice was not per se unreasonable). J.D. argues that the timing of his request was reasonable because he wasn't asking Shields Tavern to take any action or provide any additional services. He also points to evidence that Shields Tavern allows outside food for toddlers and infants without prior notice. Thus, we believe J.D. has put forth sufficient evidence such that a jury could find his request reasonable despite the lack of notice.

Next, Colonial Williamsburg argues that J.D.'s requested modification is unreasonable because it is contrary to the Virginia Health Code and presents safety and liability risks. Neither argument suffices to show that J.D.'s requested modification is unreasonable as a matter of law.

The relevant state health code provision bars "[f]ood prepared in a private home" from being "used or offered" in a restaurant. 12 Va. Admin. Code § 5-421-270(B). While there is no Virginia case law interpreting this provision, we agree with J.D. that this provision prohibits restaurants from serving food prepared in a private home, but it doesn't necessarily prohibit customers from bringing in outside food.

And although "[a] public accommodation may impose legitimate safety requirements that are necessary for safe operation," 28 C.F.R. § 36.301(b), such requirements won't inevitably override a reasonable modification request. *See Lamone*, 813 F.3d at 508 ("[R]equiring public entities to make changes to rules, policies, practices, or services is exactly what the ADA does." (citation omitted)). Moreover, it's unclear if J.D.'s request would truly pose a safety concern. There is no evidence about the risks of contamination from J.D.'s meal, and (as the record shows) Shields Tavern permits guests to bring outside food in other circumstances.

Our discussion thus far exemplifies the fact-intensive nature of this reasonableness inquiry. Such an inquiry is best left to a jury, who can weigh the competing evidence and make credibility determinations. Because J.D. has put forth evidence from which a jury may infer that the requested modification is reasonable under these circumstances, *see Halpern*, 669 F.3d at 464, we hold that there is a genuine dispute of material fact on reasonableness.

## C.

Finally, we consider whether the requested modification would "fundamentally alter the nature" of the goods and services. 42 U.S.C. § 12182(b)(2)(A)(ii). "Under the ADA,

21

a failure to make a reasonable modification is itself an act of discrimination unless the place of public accommodation can demonstrate that implementing the modification would fundamentally alter the nature of the program." *Montalvo v. Radcliffe*, 167 F.3d 873, 877 (4th Cir. 1999). Unlike the first two inquiries, the defendant bears the burden here. *See Lamone*, 813 F.3d at 508. But like the first two inquiries, we hold there is a genuine dispute of material fact as to whether granting J.D.'s request would have fundamentally altered the nature of the Colonial Williamsburg experience.[9]

A "fundamental alteration" is a "modification to 'an essential aspect' of [a public accommodation's] program." *Halpern*, 669 F.3d at 464 (quoting *Martin*, 532 U.S. at 683). In *Martin*, the Supreme Court considered whether a waiver of the PGA Tour's walking rule would fundamentally alter the nature of the tournaments. The Court first observed that the walking rule is "not an essential attribute of the game itself." 532 U.S. at 684. The Court then rejected the argument that a waiver of this peripheral rule would alter the character of the competition by giving Martin an unfair advantage. Accepting that "the purpose of the walking rule is to subject players to fatigue, which in turn may influence the outcome of tournaments," the Court held that the purpose of the rule was "not compromised in the slightest" by the accommodation because it was uncontested that Martin "easily endures

---

[9] In the district court, J.D. moved for partial summary judgment and to strike Colonial Williamsburg's affirmative defense of fundamental alteration. The district court declined to reach this issue in light of its disposition granting summary judgment on the necessary inquiry. We need not address J.D.'s motions since a genuine dispute of material fact precludes summary judgment for either party on this issue.

22

greater fatigue even with a cart than his able-bodied competitors do by walking." *Id.* at 690. Thus, the modification did not fundamentally alter the tournament.

We reached a different conclusion in *Montalvo*. There, a father tried to enroll his 12-year-old son, who was HIV-positive, into karate classes. 167 F.3d at 875. The karate school denied the boy enrollment due to the risk of transmitting HIV to other students through physical contact and frequent bloody injuries. *Id.* We held that the school was entitled to reject a modification that would "soften the teaching style of its program." *Id.* at 879. This program's "unique niche in the market was its adherence to traditional, 'hard-style' Japanese karate," and contact between participants "was an integral aspect of such a program." *Id.* Thus, requiring the school to make its program less combat-oriented would "constitute a fundamental alternation of the nature of its program." *Id.*

The case before us falls somewhere between *Martin* and *Montalvo*. On one hand, as Colonial Williamsburg argues, food service is an essential aspect of Shields Tavern. Indeed, it's *the* essential aspect. Thus, a jury could reasonably find that requiring the Tavern to allow outside food would fundamentally alter the nature of this service. On the other hand, a jury could reasonably conclude that granting J.D.'s specific request would not have affected the experience of the other patrons in the restaurant. And though food sales are essential to Shields Tavern's bottom line, there is no evidence that Colonial Williamsburg has been deluged with requests from people seeking to bring in outside food such that it couldn't give "individualized attention to the handful of requests that it might receive." *Martin*, 532 U.S. at 691. Thus, a jury could reasonably find that accommodating the occasional request of someone with severe food sensitivities would not fundamentally

23

alter the Tavern's business model, especially if other family members purchase food or (as happened here) if the meals are already paid for as part of a group rate. In short, the question whether granting J.D.'s request would fundamentally alter the nature of Shields Tavern's services may reasonably be resolved in favor of either party. Accordingly, this issue too is for a jury to decide.

***

For the reasons given, we vacate the district court's judgment and remand this case for further proceedings consistent with our opinion.[10]

*VACATED AND REMANDED*

---

[10] Because Colonial Williamsburg is no longer the prevailing party, we also vacate the award of costs in its favor.

WILKINSON, Circuit Judge, dissenting:

The majority's almost per se rule forces restaurants throughout the Fourth Circuit to give up control over their most valuable asset: the food they serve. This is a terrible rule. It forces restaurants to allow customers to bring in food prepared off the premises, in who knows what conditions, containing who knows what ingredients. It exposes the restaurants' patrons to public health risks, subjects the restaurants themselves to legal liability, and deprives servers of much needed tips. The accommodation requested in this case was not necessary because of the Tavern's offer of a gluten-free meal prepared in house, which is what the district court and magistrate judge so found. I would certainly uphold their judgment, and additionally I would hold that the requested modification was unreasonable. For these reasons, I respectfully dissent.

## I.

The magistrate's report and recommendation, adopted in full by the district court, J.A. 423, describes the Americans with Disabilities Act's requirement on places of public accommodation. J.A. 332-34. As relevant here, those requirements come from clause 12182(b)(2)(A)(ii) of Title 42, which defines discrimination as

> a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations;

The Supreme Court explained that this clause contemplates "three inquiries[:]" whether the modification requested by the disabled individual is necessary, whether it is reasonable,

25

and whether it would fundamentally alter the nature of the public accommodation. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 683 n. 38 (2001). Accordingly, a public accommodation is not discriminating against a disabled individual by refusing to provide a modification that is not necessary or is not reasonable, which in my view is all that Colonial Williamsburg has done. While the majority claims its analysis is "individualized," Maj. Op. at 13, it is, as I shall demonstrate, tantamount to a ruling that restaurants must accept meals prepared outside their premises as a matter of course.

## II.

I begin with necessity. Necessity is determined with respect to the disabled person's ability to obtain "full and equal enjoyment" of a public accommodation. 42 U.S.C. § 12182(a). This court recognizes, of course, that it is not always possible for the experience of a disabled person to be "identical" to that of a person who does not suffer from a disability. *Feldman v. Pro Football, Inc.*, 419 F. App'x 381, 391-92 (4th Cir. 2011). Rather, the ADA simply requires that a disabled customer have an experience that is "as equal as possible[.]" *Id.*; *see also Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012); *Argenyi v. Creighton Univ.*, 703 F.3d 441, 447-49 (8th Cir. 2013). As long as a disabled guest has "meaningful access" to a place of public accommodation, the ADA's requirements are satisfied. *Argenyi*, 703 F.3d at 448.

The availability of a Tavern-prepared gluten-free meal allowed J.D. "meaningful access" to the restaurant's offerings and renders the modification sought by J.D. unnecessary. When J.D. arrived at the Tavern on his class trip, the head chef, Anthony Zurowski, offered to personally make and serve J.D. a gluten-free meal. Had J.D. accepted

26

this offer, he would have been able to sit with his classmates inside the Tavern and enjoy its educational offering along side them. But, instead of accepting the offer, J.D. decided that he would eat a meal prepared at home. He was asked by the Tavern to do so at some nearby picnic tables. After finishing his home-prepared meal, J.D. rejoined his classmates in the Tavern for the remainder of their time there.

I fully respect J.D.'s desire for a gluten-free meal. As appellant notes, Celiac Disease and Non-Celiac Gluten Sensitivity can, if not properly managed, result in severe health effects. Opening Br. for Appellant at 8-9. Of course J.D. should take all reasonable precautions to keep his condition in check, and of course his father is to be commended for wanting to do what he can to protect his son. J.D.'s dietary restriction makes great sense. If the Tavern, a well-known tourist destination that serves multitudes of patrons from around the world, were not offering J.D. a gluten-free meal we would have a different case.

But that is not what happened here. In this case, J.D.'s own expert testified that the meal offered by Zurowski—baked chicken and potatoes—would be gluten-free. There is no dispute that Zurowski had extensive training as a chef, including one-on-one training from Colonial Williamsburg's head chef specifically focused on gluten-free meal preparation. J.A. 87-88. In light of that training, there is no dispute that Zurowski knew how to ensure that J.D.'s gluten-free meal was not contaminated by any trace amounts of gluten: he knew to use a separate designated area to prepare the meal, he knew to sanitize the area and his utensils beforehand, he knew to use a fresh set of gloves and apron, and he knew to use a separate oven. J.A. 337-39. Once it left the kitchen, there is no dispute that the Tavern's procedures required that J.D.'s meal be labeled as gluten-free and that it be

27

specially covered with a metal lid to avoid cross contamination. J.A. 339. And there is no dispute that the Tavern had extensive experience preparing gluten-free meals for patrons with disabilities that were similar to J.D.'s: Over the past five years, Zurowski had prepared roughly four to five gluten-free meals a day, for a total of over 5,000 meals, without ever receiving a single complaint that the meals actually contained gluten. J.A. 339. J.D.'s father even admitted he had no reason not to trust the Tavern's kitchen staff. J.A. 341.

J.D. does allege two unfortunate experiences at other restaurants assertedly offering gluten-free meals. But the reasons for those restaurants' purported failures are but hastily and sketchily described in the record, while a wealth of undisputed information attests to the rigor and adequacy of the Tavern's preparations. Given the unchallenged facts, the district court was absolutely correct to grant appellee's summary judgment motion. Had J.D. accepted the Tavern's bona fide offer of a gluten-free meal, his experience would have been almost identical to that of his classmates. Any difference in his experience was caused by his rejection of that offer and his desire to replace the Tavern's accommodation with his own. But the ADA does not require places of public accommodation to provide the precise modification requested by the disabled individual. *Callum v. CVS Health Corporation*, 137 F.Supp.3d 817, 840 (D.S.C. 2015) (citing *McElwee v. Cnty of Orange*, 700 F.3d 635, 641 (2d Cir. 2012)). Rather, the ADA allows places of public accommodation like Shields Tavern the freedom to decide how best to provide "meaningful access" to patrons with disabilities. The undisputed facts in the record demonstrate convincingly that the Tavern's offer to J.D. meets this standard; J.D.'s requested modification was not necessary.

III.

In addition to being unnecessary, J.D.'s requested modification was not required by the ADA because it was unreasonable. *See PGA Tour*, 532 U.S. at 683, n.38. As the majority concedes, "[f]acilities are not required to make any and all possible accommodations that would provide full and equal access to disabled patrons[;]" they "need only make accommodations that are reasonable." Maj. Op. at 18 (quoting *Baughman v. Walt Disney World Co.,* 685 F.3d 1131, 1135 (9th Cir. 2012)). Reasonableness, in turn, is evaluated with respect to the "disruption of [the restaurant's] business" and the threat to "safety" occasioned by the modification. *Baughman*, 685 F.3d at 1135.

A policy that allows patrons to consume home-prepared meals inside the Tavern with no advance notice would effect a significant disruption in the Tavern's business. Shields Tavern, unlike most of Colonial Williamsburg, is primarily "in the business of selling food." Br. for Appellee at 30. It is further in the business of providing "the atmosphere of an eighteen-century colonial tavern[,]" with an eye toward educating patrons about our shared past. J.A. 342. We need not decide between these two characterizations of the Tavern's business, because they are easily reconcilable: The Tavern's menu—like its interior design, the costume of its servers, and the presence of reenactors—works to create the overall impression of being transported back in time. J.A. 59-60.

Allowing patrons to ignore the restaurant's menu would disrupt this business. It would let people bring in their own meals, occupy the Tavern's tables, engage the time and attention of the Tavern's servers, and otherwise divert the Tavern's resources from paying customers, all without ever purchasing food from the Tavern itself. The disruption is plain. Such a policy would deny the restaurant much-needed revenue—the restaurant business is

29

notoriously a low-margin one. It would also deny the servers the gratuities they rely on to make ends meet, as tips are usually calculated with respect to the cost of the food ordered from the restaurant. These disruptions are in no way mandated by the ADA.

The proposed modification would also disrupt the carefully cultivated eighteenth-century atmosphere of the Tavern. The dishes served at the Tavern, while "modern[,]" Br. for Appellee at 30, are consistent with the "atmosphere" identified by the magistrate judge. J.A. 342. The aroma and appearance of turkey or chicken would not be too alien to Williamsburg's early inhabitants. But allowing patrons to consume home-prepared meals would open the gates to all manner of cuisines, without any respect for the Tavern's historical theme. People could bring in food that is utterly inconsistent with the atmosphere provided by the Tavern. The smell of such food, or even its appearance, would spoil and undercut the experience for paying customers.

But that is not all. In addition to the disruptions to the Tavern's business, the proposed modification is also unreasonable because it poses safety hazards to the Tavern's other customers. The presence of outside food in the restaurant presents a risk of provoking food allergies or sensitivities in other patrons. The Commonwealth of Virginia may have had this concern in mind when it enacted the provision of its health code that prohibits "[f]ood prepared in a private home" from being "used or offered" by a restaurant. 12 Va. Admin. Code 5-421-270(B). Whether or not it actually prohibits customers from consuming their own home-prepared meal in a public restaurant, the provision demonstrates that the Commonwealth knows well the risks of food prepared in private, uninspected kitchens. Another section of Virginia's health code would make the Tavern

30

legally responsible should the outside food contaminate the food prepared in the restaurant. *See* 12 Va. Admin. Code 5-421-690. These provisions do not trump the ADA, but they certainly bear on the reasonableness of the proposed modification.

These safety concerns are particularly pressing in light of the erosion of public health systems more generally. Public health and sanitation may not rank among humanity's most glamorous and heralded medical achievements, but they have contributed immeasurably to the quality of life we enjoy. They cannot, however, be taken for granted: Contagions as diverse as Ebola and measles might suggest the need for sanitary vigilance even to the unwary. *See, e.g.* "Measles," *Epidemiology and Prevention of Vaccine-Preventable Diseases*, Centers for Disease Control and Prevention (13th ed. 2015). Public health departments and restaurants cannot afford the luxury of carelessness where, as here, they deal in such basics as the safety of food and water.

Finally, the proposed modification is unreasonable because it imposes a vague and unmanageable standard on restaurants everywhere. The majority's rule means that a patron's demand that he be allowed to eat outside food will sometimes be reasonable and other times not. This puts managers in the middle of a difficult line-drawing exercise: What criteria are they supposed to use in navigating the tension between the ADA's requirements and public health law? Which privately prepared meals must they allow and which may they refuse? The majority wouldn't even require advance notice from customers in J.D.'s position, meaning that managers will have to evaluate the disruption and the safety hazard of a customer's outside meal on the fly, with the specter of litigation hanging overhead.

IV.

31

The majority holds that forcing restaurants to give up control over the food they serve is a perfectly reasonable thing to do. While the majority claims its analysis is "individualized," Maj. Op. at 13, the real-world consequences of its ruling are sweeping in effect. Even restaurants which, like the Tavern, have made indisputably rigorous and wholly commendable efforts to prepare gluten-free meals and thereby accommodate people with J.D.'s disability are strung up. Only in the judicial monastery could this impractical and unworkable requirement hatch. While the holding here is not the end of the matter—Colonial Williamsburg may well prevail at trial—it has the flavor of a de facto per se rule: Restaurants must either allow patrons to consume food prepared outside their premises or must justify their refusal at a costly trial. In practice, I suspect many will forgo the litigation and simply fold the tent. Thus do we bid a rule whose health and safety benefits are self-evident farewell.